STATE OF CONNECTICUT *v.* NICHOLAS J. WASSIL (15142)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

*(Two justices concurring separately)*

Argued February 6—decision released May 16, 1995

*John L. Stawicki*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, assistant state's attorney, with whom, on the brief, was *James E. Thomas*, state's attorney, and *Paul E. Murray*, senior assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this criminal appeal is whether the defendant could be convicted of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3)[1] for his role in delivering narcotics to a victim who subsequently injected the narcotics into his own body. In a two count information,

---

[1] General Statutes § 53a-55 provides: "MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

the state alleged that the defendant, Nicholas J. Was-sil, had committed the crime of sale of narcotics in violation of General Statutes § 21a-277[2] by providing "to another, to wit: David Groleau, a narcotic substance, to wit: HEROIN . . ." and had committed the crime of manslaughter in the first degree in violation of § 53a-55 in that he had, "under circumstances evincing an extreme indifference to human life, recklessly engage[d] in conduct [that] created a grave risk of death to David Groleau, to wit: the delivery of a narcotic substance to said David Groleau and assisting said David Groleau in administering that narcotic substance to himself, thereby causing the death of said David Groleau . . . ." A jury returned verdicts of guilty on both counts, and the trial court rendered judgment thereon. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm.

The jury reasonably could have found the following facts. On the evening of December 3, 1991, the defendant and his friend David Groleau were at Groleau's home in New Britain. The defendant knew that

---

[2] General Statutes § 21a-277 provides in relevant part: "(FORMERLY SEC. 19-480). PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENSING. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned. . . ."

Groleau, who was an alcoholic and who previously had used depressants such as Valium and Percocet, "had been drinking and doing pills" during the course of the day. The defendant also knew or should have known that, by early evening, Groleau was very intoxicated. Witnesses who saw Groleau at the time testified that he was visibly inebriated.

Between 6 and 6:30 p.m., the defendant telephoned Danny Kiley, a friend of both the defendant and Groleau. The defendant asked Kiley to give him and Groleau a ride to Main and Glen Streets in New Britain so that they could purchase some heroin. Kiley agreed. Kiley then drove the defendant and Groleau to the requested address, where Kiley and Groleau both gave the defendant money for the purpose of purchasing heroin. The defendant exited the car alone, entered a building on the corner and returned to the car with heroin. Kiley then drove the defendant and Groleau back to Groleau's home.

At Groleau's home, the defendant prepared one "bag" of the heroin and injected the heroin into his own arm. The defendant exclaimed that the heroin was "very, very good," which Kiley took to mean that it was particularly potent. The defendant then gave another bag of heroin to Groleau, who injected the heroin into his own arm.[3] Groleau, who was approximately thirty to forty pounds heavier than the defendant, injected the same amount of heroin as had the defendant.

Approximately fifteen seconds after Groleau had injected the heroin into his arm, Groleau lost conscious-

---

[3] At trial, Kiley testified that it was the defendant who had prepared the heroin and who had injected it into Groleau's arm. As the state concedes, however, the jury necessarily rejected Kiley's testimony on this point, because it acquitted the defendant of manslaughter in the first degree by administering the narcotic to Groleau.

ness and collapsed onto the floor. After determining that Groleau was still breathing, Kiley and the defendant attempted to awaken him by walking him around and placing him in a cold shower. Although Kiley warned the defendant that Groleau needed medical assistance and twice attempted to call 911, the defendant prevented Kiley from completing the calls by hanging up the telephone. The defendant then told Kiley to leave Groleau's house, and Kiley complied. When Kiley left Groleau's house, Groleau was still breathing, although he had not regained consciousness.

At some point thereafter, Groleau stopped breathing. The defendant then attempted, unsuccessfully, to contact Groleau's parents. Thereafter, at approximately 8 p.m., or approximately one hour after Groleau initially had lost consciousness, the defendant called 911 and requested an ambulance.

Paramedics arrived at Groleau's home at approximately 8:08 p.m. and determined that Groleau was unconscious, unresponsive, asystolic, cyanotic and in cardiac arrest.[4] One paramedic asked those present whether Groleau had consumed any drugs. The defendant volunteered no information in response to the paramedic's questions.

Although the paramedics immediately began cardiopulmonary resuscitation of Groleau and established an intravenous line in order to administer various medications to him, including the narcotic antagonist Narcan, they were unable to revive Groleau. At trial, a paramedic testified that the drug Narcan can reverse the effects of heroin and return a patient's breathing

---

[4] At trial, a paramedic explained that the term "unresponsive" signified that Groleau had not responded either to being shaken or to receiving a sternum rub; that the term "cyanotic" meant that Groleau's skin had had a bluish tint; and that the term "asystolic" meant that Groleau had had no electrical activity in his heart.

and heart rate to normal, but that it is effective only if administered before the patient has suffered a cardiac arrest.

The paramedics thereafter transported Groleau to New Britain General Hospital, where he was pronounced dead at 8:47 p.m. After performing an autopsy, the medical examiner determined that Groleau had consumed alcohol, Valium and heroin prior to his death. The medical examiner described the cause of death as "combined acute drug toxicity." At trial, the medical examiner further testified that the levels of alcohol and Valium alone in Groleau's blood were not lethal, that the level of heroin alone was "potentially life-threatening," and that Groleau would not have died but for the administration of the heroin.[5] The defendant offered no evidence to rebut the medical examiner's testimony.

At the close of the evidence, the court instructed the jury that, with respect to the charge of manslaughter in the first degree, the jury should return special verdicts on two separate theories of criminal liability. First, the jury was to decide whether the defendant was guilty of manslaughter "by delivery of narcotics." Second, the jury was to decide whether the defendant was guilty of manslaughter by "assisting in administering the narcotics." The jury also was instructed that there was "no requirement that [the two verdicts] be the same verdict."

With respect to the charge of sale of narcotics, the court instructed the jury that "[s]ale is any form of

[5] Groleau's blood level of diazepam, the active ingredient in Valium, was 0.06 milligrams per liter, which the medical examiner characterized as a "therapeutic" level. Groleau's blood alcohol level was 0.18 percent, which the medical examiner characterized as "significant," but not "lethal." Groleau's blood level of morphine, a heroin derivative, was 0.20 milligrams per liter, which the medical examiner characterized as "significant" and "potentially life-threatening."

delivery. You were all questioned about your use of common terms and ability, willingness to consider that the law has sometimes different definitions. The definition of sale is delivery. Delivery meaning the actual transfer from one person to another." The court refused the defendant's request that the jury also be instructed that it had to find that the defendant "deliver[ed] the drugs or some portion of them to another . . . for a valuable consideration." The defendant then excepted to the charge as given on the grounds that "at the very least the jury instructions should have included the entire statutory definition of sale, which is that [sale is] any form of delivery which includes barter, exchange or gift or offer [therefor] . . . . Not ending the definition of sale with any form of delivery." The court gave the jury no supplemental instructions relating to the definition of "sale."

The jury found the defendant guilty of both counts of the information. As to the charge of manslaughter in the first degree, the jury found him guilty by delivery of a narcotic substance, but not guilty by assisting in the administration of the narcotic substance.

Thereafter, the defendant moved for a judgment of acquittal on the charge of manslaughter in the first degree. He argued that, in acquitting him of manslaughter by assisting in the administration of narcotics, the jury necessarily had found that Groleau had administered the narcotics to himself. In light of this factual finding, the defendant contended that he could not, as a matter of law, be held responsible for Groleau's death, because the death was caused not by his delivery of the narcotics but by Groleau's self-injection of the narcotics, which was, therefore, an efficient intervening cause of the death. The trial court denied the defendant's motion.

On appeal to this court, the defendant claims that the trial court improperly refused: (1) to acquit the defendant of manslaughter in the first degree; and (2) to instruct the jury that the crime of sale of narcotics required proof that the drugs had been delivered for consideration. We reject both claims and affirm the judgment of the trial court.

I

We first discuss whether the trial court improperly refused to acquit the defendant of manslaughter in the first degree. The defendant argues that the jury's implicit finding that Groleau administered the heroin to himself requires an acquittal on the charge of manslaughter by delivery of the drug to Groleau. Specifically, the defendant argues that Groleau's self-injection, as a matter of law, was an efficient intervening cause of Groleau's death, so that the defendant's delivery of the drug, as a matter of law, did not cause Groleau's death. We disagree.

To prove causation, the state is required to demonstrate that the defendant's conduct was a "proximate cause" of the victim's death—i.e., that the defendant's conduct contributed substantially and materially, in a direct manner, to the victim's injuries and that the defendant's conduct was not superseded by an efficient intervening cause that produced the injuries. *State* v. *Leroy*, 232 Conn. 1, 13, 653 A.2d 161 (1995); *State* v. *Spates*, 176 Conn. 227, 233–34, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979). " 'Proximate cause' in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of

death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. . . . It is unnecessary for 'proximate cause' purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible." (Citations omitted.) *State* v. *Spates*, supra, 233–35.[6] The defendant's conduct need not be *the* predominating cause or *the* substantial factor in bringing about the victim's injuries, so long as his conduct was "a cause that necessarily set in operation the factors that accomplish the injury." *State* v. *Leroy*, supra, 13.

Applying the law of causation in the context of our manslaughter statute, we previously have considered and rejected a claim similar to that of the defendant here. In *State* v. *Pellegrino*, 194 Conn. 279, 480 A.2d 537 (1984), the evidence showed that a fire recklessly set by the defendant and his accomplice had resulted

---

[6] In instructing the jury as to the element of causation, the trial court read to the jury, verbatim, the same definition of proximate cause that we quote here. The defendant raises no challenge to the court's instructions on this issue. The defendant thus does not claim that an additional instruction should have been given relating to the definition of "efficient, intervening cause." Cf. *State* v. *Munoz*, 233 Conn. 106, 122, 659 A.2d 683 (1995) (where evidence was sufficient to raise reasonable doubt as to whether victim's death resulted from intervening cause, trial court improperly failed to instruct jury as to law of intervening cause).

in the accomplice's death. The defendant contended that, as a matter of law, the accomplice's conduct should relieve the defendant of criminal responsibility for the accomplice's death. We rejected the claim, holding that "the fact that [the accomplice also] may have been negligent with respect to his own safety can no more relieve the defendant of criminal liability than if [the accomplice] had been an innocent victim who was contributorily negligent." Id., 296. We further explained that the question of whether the defendant's conduct caused the victim's death in the circumstances of that case was not a question of law but a question of fact for the jury. Id., 294–96 and 296 n.22; see also *State* v. *Alterio*, 154 Conn. 23, 30, 220 A.2d 451 (1966).[7]

---

[7] In our civil cases, likewise, this court and the Appellate Court generally have rejected the defendants' arguments that, as a matter of law, there had been intervening causes of the plaintiffs' injuries. See, e.g., *Merhi* v. *Becker*, 164 Conn. 516, 522–23, 325 A.2d 270 (1973) (jury could find that defendant sponsor of picnic proximately caused plaintiff invitee's injuries by serving alcohol to invitees and failing to hire adequate security; intentional act of other invitee in driving his vehicle into plaintiff not intervening cause as matter of law); *Somma* v. *Gracey*, 15 Conn. App. 371, 375–77, 544 A.2d 668 (1988) (jury could find that defendant attorneys proximately caused losses incurred by clients in sale of company by failing to perform due diligence investigation of purchasers; criminal acts of company's purchasers not intervening cause as matter of law); but see *Burns* v. *Gleason Plant Security, Inc.*, 10 Conn. App. 480, 486, 523 A.2d 940 (1987) (third party's acts were intervening cause as matter of law; "[w]hen Coons left the keys in the unlocked car in a high crime area, it may well have been a foreseeable risk that the car would be stolen by a third party and negligently operated so as to cause harm to an innocent party. . . . It was not also foreseeable, however, that a third party would steal the car, drive elsewhere, leave the car, enter a store, commit an armed robbery, and assault an innocent person in the course of that robbery." [Citation omitted.])

In one line of civil cases, however, we historically have accepted an argument similar to that made by the defendant here. At common law, it was the rule that a provider of alcohol could not be held liable for damage caused by the consumer of the alcohol, because the consumer's voluntary ingestion of the alcohol, as a matter of law, was said to be an efficient intervening cause of such damage. See *Slicer* v. *Quigley*, 180 Conn. 252, 255–56, 429 A.2d 855 (1980), and cases cited therein. We have continued to adhere to this rule despite its logical infirmities; see *Quinnett* v. *Newman*, 213 Conn.

Notwithstanding these precedents, the defendant argues in this case that a victim's self-administration of drugs, as a matter of law, is an efficient intervening cause of his own death, thus barring any manslaughter prosecution of the person delivering the drugs. According to the defendant, the legislature simply did not intend the manslaughter statute to apply to individuals who deliver, but do not administer, narcotics whose consumption results in death. The defendant bases his argument on two cases from the New York courts, the first of which dismissed a manslaughter indictment where the defendant had delivered but had not injected the heroin that resulted in the victim's death; *People* v. *Pinckney*, 38 App. Div. 2d 217, 328 N.Y.S.2d 550 (1972), aff'd without opinion, 32 N.Y.2d 749, 297 N.E.2d 523, 344 N.Y.S.2d 643 (1973); and the second of which affirmed a manslaughter conviction where the defendant had both delivered and injected the heroin that resulted in the victim's death; *People* v. *Cruciani*, 36 N.Y.2d 304, 327 N.E.2d 803, 367 N.Y.S.2d 758 (1975). According to the defendant, the New York courts distinguished between delivery of narcotics and administration of narcotics for purposes of the manslaughter statute on the basis of the New York legislature's intent, and, because of our frequent reliance on New York's interpretations of its penal code, we should recognize the same distinction on the basis of the Connecticut legislature's intent.

---

343, 351–52, 568 A.2d 786 (1990) (*Peters, C. J.,* dissenting); because of alleged legislative acquiescence in the rule as manifested by the Dram Shop Act. Id., 347 (majority opinion); see General Statutes § 30-102. There has been no similar legislative determination that would persuade us to conclude that every victim's self-administration of drugs is an efficient intervening cause of his own death, regardless of the factual circumstances in which those drugs may have been delivered to the victim. In any event, the civil law rule discussed in *Slicer* v. *Quigley,* supra, 255–56, would not be applicable in light of the specific factual circumstances of this case.

The defendant's argument is unpersuasive for two reasons. Careful examination of the New York cases discloses that New York has not created an absolute distinction between the delivery of narcotics and the administration of narcotics for purposes of its manslaughter statute. Furthermore, even if the New York law were as the defendant represents it to be, the New York precedents would be inapposite in Connecticut because of the differences between the Connecticut and New York statutory schemes.

A

The defendant is correct that, in *Pinckney*, the Appellate Division of the New York Supreme Court barred a drug related manslaughter prosecution on the basis of its conclusion that such a prosecution did not comport with the intent of the New York legislature. The *Pinckney* decision itself, however, did not suggest that the New York legislature had intended to distinguish, for the purposes of its manslaughter statute, between deaths resulting from the delivery of drugs and deaths resulting from the administration of drugs. Rather than focusing on such a distinction as a ground for dismissal of the indictment, the court in *Pinckney* stated: "As long ago as 1897, the State of New York has had legislation dealing with narcotics. . . . Since 1938 the State has attempted to control the sale, use and distribution of narcotic drugs with further legislation . . . . In 1969 the punishment to be imposed upon persons convicted of drug crimes was increased . . . . However, the legislation did not include in an amendment or addition to the homicide provisions of the Penal Law *any reference to death caused by the use of dangerous drugs*. In our opinion, if the Legislature had intended to include homicide by the selling of dangerous drugs, it would have amended the sections in the Penal Law relating to homicide." (Citations omitted; emphasis added.) *People* v. *Pinckney*, supra, 38 App. Div. 2d 220–21.

The defendant also is correct that in *Cruciani,* in which the defendant actually had injected the narcotics into the victim, the New York Court of Appeals affirmed a manslaughter conviction. Like the *Pinckney* opinion, however, the *Cruciani* opinion did not suggest that its holding depended upon a finding that the New York legislature had intended to allow manslaughter prosecutions based on the administration of drugs, but not based on the mere delivery of drugs. In the intervening years, the New York statutes had remained unchanged, so that, at the time *Cruciani* was decided, there still was no evidence of any express legislative intent to treat as homicides "any . . . death[s] caused by the use of dangerous drugs." *People* v. *Pinckney,* supra, 38 App. Div. 2d 221. The court in *Cruciani* therefore recast the *Pinckney* holding, concluding that the earlier decision had been based not on legislative intent, but rather on the insufficiency of the evidence of causation in the earlier case. The conviction could be upheld in *Cruciani,* on the other hand, because, on the facts of that case, there was sufficient evidence of causation. The court noted that, unlike the defendant in *Pinckney,* the defendant in *Cruciani* had injected the drugs into the victim at a time when he knew that the victim already was " 'completely bombed out on downs.' " *People* v. *Cruciani,* supra, 36 N.Y.2d 305. The court then explained the result in *Pinckney* as follows: "[In *Pinckney,*] the defendant had sold the drug to the deceased, but did not inject the heroin. Nor was there any proof, as here, of awareness of the ongoing effect of drugs in the victim's body at the time any self-inflicted injection might have been made, or, beyond the general knowledge of the injuriousness of drug-taking, of a real threat to life. The *remoteness of that fatal injection from the fact of sale* diffused intent and scienter by possibly unknown or intervening events beyond Pinckney's control." (Emphasis added.) Id., 305–306.

Subsequent to *Cruciani*, and on the basis of its holding in that case, the New York Court of Appeals further explained that a defendant's acts may "cause" the victim's death even if the victim administers the fatal dose of drugs to himself or herself. *People* v. *Galle*, 77 N.Y.2d 953, 955–56, 573 N.E.2d 569, 570 N.Y.S.2d 481 (1991), citing *People* v. *Cruciani*, supra, 36 N.Y.2d 304. In *Galle*, the evidence showed that the "defendant [had] injected the decedent with her first two doses of cocaine, knowing full well that she planned to continue taking injections that evening until their relatively substantial supply of the drug had been exhausted," but "the decedent subsequently [had] administered her own injections, including the one which immediately preceded her death . . . ." *People* v. *Galle,* supra, 955. Without discussing legislative intent or attempting to distinguish between prosecutions based on delivery of drugs and those based on administration of drugs, the court affirmed the defendant's conviction. It concluded that the jury's finding of causation had been appropriate in light of the record evidence that, at the time of the defendant's acts, the decedent's subsequent actions in administering her own injections had been foreseeable and that the defendant's actions were a substantial factor in the decedent's death. Id.

There is no suggestion in the decision in *Galle* that the Court of Appeals would have reached a different result if all of the drugs had been administered by the victim, and the defendant had merely delivered the drugs. To the contrary, as other New York cases demonstrate, the result would have been the same. Earlier, in *People* v. *Garbarino*, 152 App. Div. 2d 254, 257, 549 N.Y.S.2d 527 (1989), the Appellate Division of the New York Supreme Court had affirmed a conviction for criminally negligent homicide on evidence that the defendants had provided twenty-seven ounces of hard liquor to their fifteen year old son and encouraged him

to drink it, even though the defendants did not physically introduce the alcohol into the victim. Subsequently, and therefore even more importantly, in *People v. Duffy*, 79 N.Y.2d 611, 595 N.E.2d 814, 584 N.Y.S.2d 739 (1992), the New York Court of Appeals upheld the defendant's conviction for manslaughter on the basis of his role in enabling and encouraging the seventeen year old victim to commit suicide by providing him with a rifle and ammunition and challenging him to kill himself when the defendant knew that the victim was already suicidal. Because "[t]he jury could rationally have concluded that the risk of [the victim's] taking these actions was something which [the] defendant should have, under the circumstances, plainly foreseen," the Court of Appeals rejected out-of-hand the defendant's argument that the victim's "act of loading the rifle and using it to kill himself constituted an intervening cause which—as a matter of law—relieved [the] defendant of criminal responsibility." Id., 616.

Although neither *Garbarino* nor *Duffy* involved the provision of narcotics, neither provides any support for the proposition that, under New York law, the rules of causation that apply to cases involving the provision of alcohol or firearms do not apply to the provision of narcotics. To the contrary, both cases suggest that there is a single, uniform rule of causation, as both cases rely on *Cruciani*, and both cases, like *Cruciani*, distinguish the result in *Pinckney* only on the ground that there was insufficient evidence of foreseeability and criminal responsibility in that particular case. See *People v. Duffy*, supra, 79 N.Y.2d 616; *People v. Garbarino*, supra, 152 App. Div. 2d 258. Since *Pinckney*, none of the New York cases—whether involving the provision of drugs or other reckless conduct—has been justified by reference to legislative intent. There is, therefore, no basis for the defendant's argument that the New York courts have recognized a legislative intent to clas-

sify as manslaughters only deaths resulting from the administration, and not the delivery, of drugs.

## B

Moreover, even if we were to accept the defendant's argument that the New York courts have recognized a legislative intent to create an absolute distinction between the administration and the delivery of drugs, we would conclude that such an intent by the legislature in New York has not been replicated by the legislature in Connecticut. Unlike the New York legislative history discussed in *Pinckney*, Connecticut's legislative history *does* reflect an intention to prosecute as homicides certain deaths resulting from the provision of drugs.[8] Our General Assembly has enacted legislation pursuant to which a person who sells narcotics for economic gain to an individual who subsequently dies as a result of using the drugs can be convicted of capital felony. See General Statutes § 53a-54b (6).[9]

---

[8] We infer such a legislative intent only from our capital felony statute. We do not consider whether we also might infer such a legislative intent from the fact that the Connecticut manslaughter statute itself differs from that of New York. Compare General Statutes § 53a-55 with N.Y. Penal Code § 125.20 (McKinney 1987) (containing language equivalent to § 53a-55 [a] [1] through [2] but containing no language equivalent to § 53a-55 [a] [3], the subsection under which this defendant was prosecuted); cf. *State* v. *Walton*, 227 Conn. 32, 45 n.11, 630 A.2d 990 (1993) (distinguishing New York cases in interpretation of General Statutes § 53a-4); *State* v. *Ortiz*, 217 Conn. 648, 654–56 and n.6, 588 A.2d 127 (1991) (relying on New York cases for interpretation of General Statutes § 53a-54a [a]); *State* v. *Asherman*, 193 Conn. 695, 732 n.12, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985) ("[b]ecause the Connecticut penal code has been modeled after its New York counterpart we have derived sustenance from the New York decisions interpreting its code").

[9] General Statutes § 53a-54b provides in relevant part: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone . . . ."

We recognize that the capital felony legislation does not expressly state that a person can be convicted of manslaughter for *recklessly* delivering narcotics, *without* economic gain, to an individual who subsequently dies as a result of using the drugs. In our assessment of the legislature's intent, however, we are mindful of the breadth of the first degree manslaughter statute as we have construed it in other circumstances. Without express legislative instructions, we have applied the statute to the conduct of a person who recklessly throws an infant into a bathtub; cf. *State* v. *Carpenter*, 214 Conn. 77, 80–81, 83, 85, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992); recklessly sets a fire; cf. *State* v. *Pellegrino*, supra, 194 Conn. 282–83; or recklessly ties up an individual who suffers from a coronary condition during the commission of a robbery. Cf. *State* v. *Spates*, supra, 176 Conn. 229–30. In this case, as well, express legislative provisions are not necessary, because the manslaughter statute broadly applies to *all* reckless conduct that occurs under circumstances evincing extreme indifference to human life, creates a risk of death to another person, and thereby causes that person's death. See General Statutes § 53a-55 (a) (3). Nothing in either the language or legislative history of our capital felony statute suggests that, in defining as a capital crime the sale of drugs for economic gain that results in death, the legislature intended completely to exempt from criminal liability the reckless delivery of drugs without economic gain that results in death. See *People* v. *Duffy*, supra, 79 N.Y.2d 615 (statute that expressly imposed criminal penalty on intentionally causing another to commit suicide did not preclude prosecution under manslaughter statute for recklessly causing another to commit suicide, as long as elements of manslaughter were proven).

In sum, we reject the defendant's claim that Groleau's conduct in administering the drugs to himself, as a matter of law, was an efficient intervening cause of Groleau's death. In so holding, we adopt the position not only of the New York courts, but of courts in the majority, if not the entirety, of the jurisdictions that have considered the question. See *People* v. *Taylor*, 11 Cal. App. 3d 57, 59, 89 Cal. Rptr. 697 (1970); *Ureta* v. *Superior Court*, 199 Cal. App. 2d 672, 676, 18 Cal. Rptr. 873 (1962); *Commonwealth* v. *Catalina*, 407 Mass. 779, 790–91, 556 N.E.2d 973 (1990); *State* v. *Thomas*, 118 N.J. Super. 377, 380, 288 A.2d 32, cert. denied, 60 N.J. 513, 291 A.2d 374 (1972); *State* v. *Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984); see generally annot., 32 A.L.R.3d 589; cf. *United States* v. *Sargent*, 18 M.J. 331, 333, 339 and n.6 (Court of Military Appeals 1984) (where statute treats as manslaughter both death occurring "while [defendant is] perpetrating or attempting to perpetrate an offense . . . directly affecting the person" and death "by culpable negligence," mere distribution of narcotics to victim does not "directly affect the person" but may constitute manslaughter "by culpable negligence" [internal quotation marks omitted]).

We conclude, furthermore, that, on the basis of the evidence presented in this case, the jury reasonably could have found that the defendant's acts were the proximate cause of Groleau's death. The record supports the jury's finding that the defendant's conduct substantially and materially contributed, in a direct manner, to Groleau's death. The actions of the defendant in purchasing and delivering the narcotics led directly to Groleau's injection of those narcotics, and thus, to his death. But for the delivery of the narcotics, moreover, death would not have occurred. The record also supports the jury's finding that, as a matter of fact, Groleau's acts were not an efficient intervening cause

of his death. The record supports the inference, for example, that because Groleau already was inebriated at the time the defendant delivered the drugs to him, he did not voluntarily, consciously disregard a known risk to himself when he injected the drugs.[10] Because the defendant has not challenged his manslaughter conviction on any ground other than that Groleau's acts constituted an efficient, intervening cause of his death,[11] his conviction of manslaughter must be affirmed.

## II

With respect to the defendant's conviction of the crime of sale of narcotics, he renews on appeal the claims that he made at trial that the court's instructions to the jury were improper. The defendant argues that the trial court's instructions were incomplete, because General Statutes § 21a-277 requires proof not only of the delivery of narcotics, but also of delivery of the narcotics for consideration. In the alternative, even if proof of consideration was not necessary, the defendant argues that the trial court should have read to the jury the entire statutory definition of "sale," rather than simply defining sale as "any form of delivery." We reject both of the defendant's arguments.

The defendant's first claim is refuted by the express language of General Statutes § 21a-240 (50), which provides that, for purposes of § 21a-277, " '[s]ale' is any

[10] We do not decide whether, without such evidence, Groleau's acts would have been an efficient intervening cause of his own death as a matter of law. See *State* v. *Pellegrino*, supra, 194 Conn. 296 n.22.

[11] In the absence of such a challenge, we have no occasion to decide whether the evidence was sufficient to demonstrate that, in delivering the narcotics, the defendant had "consciously disregard[ed]" a "grave risk of death" to Groleau or that he had acted "under circumstances evincing an extreme indifference to human life." See General Statutes § 53a-3 (13) (defining standard of recklessness), and § 53a-55 (manslaughter in the first degree).

form of delivery which includes barter, exchange *or gift*, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee.'' (Emphasis added.) Because even a ''gift'' of narcotics would be a type of delivery that constituted a ''sale'' of those narcotics, § 21a-277 cannot be construed to require proof that the narcotics were delivered for consideration. See *Kriedel* v. *Krampitz*, 137 Conn. 532, 534, 79 A.2d 181 (1951) ('' '[a] gift is the transfer of property without consideration' ''); see also *State* v. *Mierez*, 24 Conn. App. 543, 551, 590 A.2d 469, cert. denied, 219 Conn. 910, 593 A.2d 136 (1991) ('' 'sale' of an illegal drug is not limited to an exchange for value''); *State* v. *Jackson*, 13 Conn. App. 288, 294, 535 A.2d 1327 (1988) (same); *State* v. *Parent*, 8 Conn. App. 469, 474, 513 A.2d 725 (1986) (same).

We also reject the defendant's alternative argument that the trial court should have read to the jury the entire definition of ''sale'' from § 21a-240 (50), rather than merely informing the jury that sale was ''any form of delivery.'' The defendant's argument is based on the premise that the statute criminalizes not just ''any form of delivery,'' but rather ''any form of delivery [that] includes barter, exchange or gift, or offer therefor.'' Thus, the defendant argues, the jury was required to determine whether this delivery was a ''barter, exchange or gift, or offer therefor'' in order to find the defendant guilty. In light of the legislative history of the statute, we conclude that the defendant's claim cannot be sustained.

As originally enacted, § 21a-240 (50) provided that '' 'sale' includes barter, exchange or gift, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee.'' General Statutes (Rev. to 1968) § 19-443 (33). In other words, ''sale'' was not originally defined nar-

rowly to mean *only* "barter, exchange or gift . . . ." but rather was defined broadly as *including* "barter, exchange or gift . . . ."

In 1972, the legislature amended the statute by inserting the words "is any form of delivery which" immediately preceding the word "includes." Public Acts 1972, No. 278, § 1. This is the language that presently appears in the statute. The express purpose of the amendment was not to limit the types of deliveries that constituted sales, but rather to "conform the language [of the General Statutes] relative to definitions, drugs, etc., to the bill that Congress [had] enacted in 1970 which is called the Comprehensive Drug Abuse Prevention and Control Act of 1970." 15 H.R. Proc., Pt. 7, 1972 Sess., p. 2591, remarks of Representative John A. Carrozzella; see 15 S. Proc., Pt. 5, 1972 Sess., p. 2046, remarks of Senator Edward S. Rimer, Jr. The federal statute, unlike the state statute, had criminalized the "distribution" of narcotics and then had defined "distribute" to mean "to deliver." Under federal law, moreover, such distribution was illegal whether or not it included a "barter, exchange, gift, or offer therefor." See 21 U.S.C. § 841 (a) (criminalizing, inter alia, "distribution" of drugs); 21 U.S.C. § 802 (11) (defining "distribute" as "to deliver"); 21 U.S.C. § 802 (8) (defining "deliver" in the same terms now contained in General Statutes § 21a-240 [11]). Apparently, therefore, the legislature added the words "includes any delivery which" to the definition of "sale" only to make it clear that, like the federal statute, the state statute prohibited any "delivery" of drugs. Indeed, in the same 1972 amendments, the legislature copied the definition of "delivery" verbatim from the federal to the state statute. Compare 21 U.S.C. § 802 (8) with General Statutes § 21a-240 (11) (" '[d]eliver or delivery' means the actual, constructive or attempted

transfer from one person to another of a controlled substance, whether or not there is an agency relationship").

We conclude, therefore, that, under § 21a-240 (50), "any form of delivery" of narcotics constitutes a "sale" of narcotics, whether the delivery is also a "barter, exchange or gift, or offer therefor." We thus read the statute as if it contained a comma after the word delivery: " '[s]ale' is any delivery, which includes barter, exchange or gift or offer therefor . . . ." See *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 189–90, 592 A.2d 912 (1991) (statute's existing punctuation "can be a useful tool for discerning legislative intent" but "is not generally considered an immutable aspect of a legislative enactment"); *Grievance Committee* v. *Dacey*, 154 Conn. 129, 136–37, 222 A.2d 339, appeal dismissed, 386 U.S. 683, 87, S. Ct. 1325, 18 L. Ed. 2d 404, reh. denied, 387 U.S. 938, 87 S. Ct. 2048, 18 L. Ed. 2d 1006 (1966) (ignoring statute's punctuation where inconsistent with legislative intent); *State* v. *Aspinall*, 6 Conn. App. 546, 550, 506 A.2d 1063 (1986) (same). Because the jury's only duty was to determine whether the defendant's acts constituted a "delivery," the trial court properly declined to read to the jury the entire definition of "sale." See *State* v. *Vessichio*, 197 Conn. 644, 650, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986) (trial court need not instruct jury as to statutory definitions that are not at issue in case).[12]

---

[12] The defendant concedes that, in light of the testimony at trial, the jury reasonably could have concluded that the defendant's acts constituted a "delivery" of narcotics under § 21a-240 (50). We thus need not discuss the meaning of "delivery" under that statute. See General Statutes § 21a-240 (11) (" '[d]eliver or delivery' means the actual, constructive or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship"); see also *United States* v. *Swiderski*, 548 F.2d 445, 451 (2d Cir. 1977) (defining "delivery" under 21 U.S.C. § 802 [8], on which § 21a-240 [11] is based, and holding that while transfer

The judgment is affirmed.

In this opinion CALLAHAN and BORDEN, Js., concurred.

NORCOTT, J., with whom BERDON, J., joins, concurring. I fully agree with part II of the majority opinion, and I concur in the result of part I. I write separately because I am concerned that part I of the majority opinion adopts an overly expansive view of causation that is, in my view, unnecessary to the resolution of this case and incorrect as a matter of policy. I concur in the result because I believe that there is ample evidence in the record in this case for the jury to have found that the defendant engaged in conduct that created a grave risk of death to another person, thereby causing his death.[1]

The defendant claims that "the *mere transfer of heroin* to another person who then injects it into himself and dies of a combined acute drug toxicity overdose" (emphasis added) does not constitute manslaughter in the first degree pursuant to General Statutes § 53a-55 (a) (3).[2] In my view, the issue, as framed by the defendant, misconstrues the nature of the record in this case. The jury reasonably could have concluded, on the basis of the evidence presented, that the defendant's acts in causing David Groleau's death went beyond the "mere transfer of heroin." Therefore, because there was sufficient evidence on the record to sustain the defendant's conviction, I would not reach the issue of whether the mere act of delivering drugs constitutes manslaughter.

of drug from agent to his principal constitutes delivery, "the sharing of drugs between two persons who simultaneously acquire joint possession" does not constitute delivery).

[1] Because the defendant did not argue that there was insufficient evidence of recklessness or that the circumstances failed to demonstrate extreme indifference to human life, I, like the majority, do not consider either of these issues. See footnote 11 of the majority opinion.

[2] See footnote 1 of the majority opinion.

From the evidence presented at trial, the jury reasonably could have found that the defendant had: (1) delivered heroin to Groleau, whom he knew or should have known to be intoxicated; (2) given one bag of heroin to Groleau stating that the heroin was "very, very good"; (3) interfered twice with Danny Kiley's effort to contact emergency medical assistance; (4) ordered Kiley to leave Groleau's home, while Groleau was still breathing; (5) waited nearly one hour after Groleau had lost consciousness before calling emergency medical assistance; and (6) refused to provide vital information to the paramedics who had attempted to render aid to Groleau.

From these facts, and other testimony at trial, the jury reasonably could have inferred that: (1) the defendant had delivered heroin to Groleau, who did not have sufficient capacity to act voluntarily; (2) the defendant encouraged Groleau to use the heroin by describing it as "very, very good"; and (3) the defendant's affirmative interference with Kiley's attempts to obtain medical assistance and his failure thereafter to provide needed information to the paramedics contributed significantly to Groleau's death.[3]

---

[3] The defendant's conduct after Groleau injected himself is relevant to the overall determination of causation. See *State* v. *Sivri*, 231 Conn. 115, 129, 646 A.2d 169 (1994); see also *State* v. *Francis*, 228 Conn. 118, 128–29, 635 A.2d 762 (1993); *State* v. *Greenfield*, 228 Conn. 62, 78, 634 A.2d 879 (1993). It is reasonable to extend the logic of these cases to include an inference that when a defendant fails to summon medical attention and affirmatively interferes with another's attempt to render aid, he evinces extreme indifference to human life, and thereby recklessly causes the death of another.

Significantly, it is not disputed that at the time that Kiley first attempted to summon assistance, Groleau was still breathing. Further, the paramedic testifying at trial stated that the effective treatment for heroin overdose is effective only before cardiac arrest occurs. Therefore, there is no danger that the correlation between the defendant's acts subsequent to Groleau's injection of heroin and Groleau's death is merely speculative. See *State* v. *Sivri*, supra, 231 Conn. 164 (*Peters, C. J.,* dissenting).

198

Thus, the jury reasonably could have determined that, on the basis of the evidence and the reasonable inferences drawn therefrom, that the defendant's conduct, as a whole, was "a cause that necessarily set in operation the factors that accomplish[ed] the injury"; *State* v. *Leroy*, 232 Conn. 1, 13, 653 A.2d 161 (1995); see p. 182 of the majority opinion; and thus recklessly caused the death of Groleau. The trial court's judgment of conviction of first degree manslaughter should be sustained on this basis and, therefore, I would not engage in further analysis of the defendant's claim. Accordingly, I respectfully concur in the result.