STATE OF CONNECTICUT *v.* ROFIO GREENFIELD
(14582)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued September 23—decision released December 7, 1993

*Beth A. Merkin,* assistant public defender, with whom was *Brian S. Carlow,* assistant public defender, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *John M. Waddock,* assistant state's attorney, for the appellee (state).

BERDON, J. The defendant, Rofio Greenfield, raises three issues on appeal: (1) whether the trial court improperly denied the defendant's motion to suppress evidence as the fruit of an illegal seizure; (2) whether the trial court improperly found probable cause to prosecute the defendant for murder; and (3) whether the trial court improperly denied the defendant's motion for judgment of acquittal due to insufficient evidence of his intent to kill.

The defendant was charged with the crime of murder in violation of General Statutes § 53a-54a (a).[1] In a hearing held pursuant to article first, § 8,[2] of the constitution of Connecticut, and General Statutes § 54-46a,[3] the trial court found probable cause to prose-

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] The constitution of Connecticut, article first, § 8, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

[3] General Statutes § 54-46a provides: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress

cute the defendant for murder. After a jury trial, the defendant was convicted of murder, and sentenced to a term of imprisonment of forty-five years. He appeals to this court pursuant to General Statutes § 51-199 (b). We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On June 25, 1990, the defendant accompanied the victim, William Dolphin, into the victim's apartment building in New Haven. They were seen entering the building together by a resident of the building, Robert Terry. The defendant and the victim went into the victim's one room efficiency apartment on the sixth floor. The defendant attacked the victim, hitting him repeatedly, targeting his head and neck, and leaving him unconscious in the hallway.

After attacking the victim, the defendant left the building at a walking pace. Terry was sitting outside, at the back of the building, with his grandson Ken Evans, and they observed the defendant as he walked by, wearing a stained shirt. The defendant turned toward them. Evans said "hey," and the defendant

or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

looked startled, then raised his hand at them and Terry waved back. The defendant then turned around and walked in a different direction.

The victim's neighbor, Concetta Apuzzo, discovered the victim lying in the sixth floor hallway and called 911. When the paramedics and police arrived on the scene, they found the victim lying unconscious in the hallway outside his apartment. The victim's face was bloodied and he had a forehead compression, a dented area of the skull. The attack had left pools of blood from the bed area through the kitchen to the outside hallway, with blood splatters and smears on a counter, wall and bed. The floor of the kitchen was so covered with blood that there was no place for the crime scene technician to walk without stepping in it. There was a broken lamp on the bed, its shade on the floor, two chairs knocked over, and the victim's two denture plates were lying on the bed and floor. The overall condition of the apartment was described by investigating officer Robert Mullins as consistent with a "violent struggle."

While the police were investigating the scene and interviewing witnesses, the defendant returned to the apartment building. At this point, the defendant had no shirt on, and his pants and shoes were covered with blood. Sergeant Anthony Griego, noticing the defendant's appearance, asked the defendant to come in the building with him and the defendant did so voluntarily. Inside, Griego found Sergeant Joseph Howard and directed Howard's attention to the defendant. At the time, Howard was talking with Terry. Terry recognized the defendant and asked him if he was the same man who had been with the victim earlier and later had waved at him. The defendant answered, "Yeah."

Officer Alpha Dacosta testified that fingerprints found on the victim's stereo cabinet and cigarette lighter matched those of the defendant. Joy Reho, a

specialist in blood and body fluid analysis at the state police forensic laboratory, tested the blood on the defendant's jeans and determined that it could not have come from the defendant and was consistent with the victim's blood type. Henry Lee, the director of the state police forensic laboratory and a crime scene reconstruction expert, testified that he had examined crime scene photographs and physical evidence to reconstruct the struggle between the victim and his assailant, using blood spatter pattern interpretation. In his opinion, there had been an attack near the bed, characterized by forceful impacts by a fist, kick, or object. At one point, the victim had been on the floor and had tried to get up, smearing blood on a wall with his hand. Blood spatters on the defendant's sneakers indicated that the sneakers must have been very near the impact, consistent with the defendant having kicked the victim.

Daniel Lowe, the victim's treating physician, testified that when the victim had been admitted to the hospital, he had abrasions and contusions around his head. X rays revealed facial fractures, including a fracture of the maxillary sinus bone, which is the supporting bone of the eye, and bilateral fractures above the eyes. Lowe opined that it would take a "major blow" transferring a considerable amount of energy to the head to cause these fractures, and stated his belief that the injuries had been caused by blows from a rapidly moving blunt object, fist or kick. Finally, Lowe testified that the defendant had remained in essentially a comatose state from the time of the assault until his death as a result of his injuries on July 9, 1990.

I

The defendant first claims that the trial court improperly denied his motion to suppress, because evidence used at his probable cause hearing and jury trial was the fruit of an unlawful seizure of his person by the

police in violation of our state constitution. The main thrust of his suppression claim is that the police effectively seized him, without probable cause, during the course of an investigative interview at the police station. After this alleged seizure, the defendant made evasive statements and manifested certain bizarre behavior, evidence that he asserts should not have been admitted at the probable cause hearing because of the exclusionary rule. Furthermore, the defendant submits that his statements and conduct gave the police probable cause to arrest, and the arrest allowed the police to confiscate his bloodied clothing as part of a search incident to arrest. Therefore, the defendant concludes, the clothing should not have been admissible at trial because it was the fruit of an unlawful seizure.[4]

If the police obtain physical evidence or statements as the result of the seizure of a person without probable cause, in violation of the constitution of Connecticut, article first, §§ 7[5] and 9,[6] the "fruit of the poisonous tree" doctrine requires that the evidence be suppressed as the product of the unlawful seizure. See *State* v. *Oquendo,* 223 Conn. 635, 659–60, 613 A.2d 1300 (1992); *State* v. *Dukes,* 209 Conn. 98, 110, 547 A.2d 10 (1988). Therefore, a two-part analysis is required: was the defendant seized; and, if so, was there probable cause for the seizure.

---

[4] The defendant's statements and conduct during the interrogation were introduced into evidence at the probable cause hearing, but not at his jury trial. His bloodied clothing was introduced into evidence at the jury trial, but not at the probable cause hearing.

[5] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[6] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if " ' "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' " *State* v. *Oquendo,* supra, 647; see *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980). Therefore, a seizure may take place under the state constitution even in a case where there is no submission by the defendant to a show of authority or use of physical force by the police. *State* v. *Oquendo,* supra, 650–52.[7]

At the suppression hearing, the trial court determined that the defendant had not been seized at any point prior to his formal arrest. The trial court's determination was a finding of fact that will not be overturned unless it was clearly erroneous. *State* v. *Torres,* 197 Conn. 620, 625, 500 A.2d 1299 (1985). When a factual issue implicates a constitutional claim, however,

---

[7] In *California* v. *Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the United States Supreme Court abandoned the "free to leave" objective standard of *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980), in favor of a narrower standard requiring a show of authority or use of physical force by the police, and submission by the defendant, before there can be a seizure. We rejected this standard under the state constitution in *State* v. *Oquendo,* 223 Conn. 635, 652, 613 A.2d 1300 (1992), adhering to the *Mendenhall* standard for suppression claims brought under the state constitution. Of course, "[i]t is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992). Although the defendant in the present case has brought his claim under both the federal and state constitutions, his argument is predicated on the *Oquendo* state constitutional standard, and we limit the scope of our review accordingly.

we review the record carefully to ensure that its determination was supported by substantial evidence. *State v. Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990) (reviewing factual findings in fourth amendment claims). At the hearing, Howard testified that his encounter with the defendant had begun in the lobby at 60 Warren Street. Howard approached the defendant, identified himself, and asked if they could talk about the incident. The defendant said that he had been a witness to the assault and would like to assist in the investigation. Howard noticed that the defendant was not wearing a shirt, and had what appeared to be blood on his hands, trousers and sneakers. The defendant told Howard that he had been socializing with the victim in the victim's apartment at the time of the attack. The defendant stated that two individuals had knocked on the victim's door, and then attacked the victim when he answered. The defendant also stated that he had a black belt in an unspecified martial art.

After hearing the defendant's description of the attack by the two assailants, Howard asked the defendant if he would go to the police department to answer more questions. The defendant consented, and rode in the front seat of Howard's police car. Howard did not place handcuffs on the defendant or restrain him in any manner. At the police station, Howard and the defendant continued their discussion in a private room, and Detective John Fracasso joined them. The room had one window to the outside, and no window on the door. The interview was not tape-recorded. The defendant never expressed any desire to stop the interview, and Howard testified that the subject of whether the defendant could leave if he wished to "never came up."

The defendant concedes that, up to this point in his encounter with the police, no seizure had taken place. "A person, even if a suspect in a crime, is not in custody every time he is asked questions at a police sta-

tion." *State* v. *Northrop,* supra, 415; see *State* v. *Williams,* 227 Conn. 101, 114–15, 629 A.2d 402 (1993). The defendant asserts, however, that a seizure occurred in the following manner. At a certain point in the interrogation, Howard left the room briefly. Fracasso also left the room and closed the door, leaving the defendant by himself, but either Fracasso or some other officer remained by the door. After speaking with other officers, Howard returned to the room, accompanied by Fracasso.

When the two police officers left the room, the defendant asserts, the nature of the encounter between police and suspect transformed, from a consensual meeting into a coercive interrogation. The defendant claims that he was seized at that time because a reasonable person, wearing clothing covered with blood stains, left alone in the closed interview room to wait for the officers' return, would have believed that the officers had taken charge of the interrogation, and the person would no longer feel free to leave. This coercive atmosphere, the defendant asserts, brought about his suspicious conduct after the officers returned to the room, conduct that the defendant claims created probable cause to arrest in two relevant respects. First, the defendant's answers to questions became less credible after the officers returned.[8] Second, when Howard told the defendant that a lamp was believed to have been a weapon used against the victim, the defendant "jumped up to his feet and started crying and hammering his fists on a table . . . and started punching and kicking the walls in the interview room." The defend-

---

[8] The defendant does not point to any statements in particular, and the suppression hearing transcript reveals no specific admissions by the defendant, but only general observations by the police officers. For example, Howard testified that "once we returned to the room . . . his actual rendition of [what] occurred just didn't add up with common sense, didn't add up with the facts that we knew, and just seemed to be consistent with when I have been deceived in the past."

ant argues that these developments provided the crucial pieces of evidence that gave the police probable cause to arrest him and confiscate his clothing incident to the arrest.[9] We disagree.

The defendant relies on *State* v. *Hoeplinger,* 206 Conn. 278, 537 A.2d 1010 (1988), for his argument that he was seized when Howard left the interrogation room. In *Hoeplinger,* the defendant Hoeplinger called an ambulance to his house to help his wife, who had been bludgeoned and strangled to death. Id., 280. Hoeplinger was covered in blood when the police arrived at his home in the early morning hours. Id., 287. He was taken directly to the police station, never informed that he was free to leave, and remained there for over thirteen hours. Id., 288. Hoeplinger had no personal transportation to return to his home, five miles away, nor did the police offer any. Id. The police preserved vital trial evidence against Hoeplinger by accompanying him to the bathroom and refusing to let him wash his hands. Id., 282–83.

In the present case, the police placed no limitations on the defendant's freedom. The defendant returned to the scene of the crime, voluntarily spoke with Howard, indicated that he wanted to cooperate, and drove willingly with Howard to the station. The defendant never asked to leave the police station.[10] Unlike

[9] After the defendant's excited reaction to Howard's mention of the lamp, Howard and Fracasso left the room a second time. Howard conferred with other officers as to whether there was probable cause to arrest, and then returned to the room and placed the defendant under arrest. The defendant stated that he did not want to be questioned further without the presence of counsel, and the interview ceased. It was then that the search incident to the arrest took place.

[10] Often, an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview. *State* v. *Northrop,* 213 Conn. 405, 414–15, 568 A.2d 439 (1990); 2 W. LaFave, Search and Seizure (2d Ed.) § 5.12, p. 390 n.23. Although the police made no such express state-

the scenario in *State* v. *Hoeplinger,* supra, where Hoeplinger was not allowed to use the bathroom alone or wash his hands, there is no evidence that the defendant's freedom of movement was restrained in any way. The interval between arrival at the station and the point that the defendant was formally placed under arrest was approximately one hour,[11] far less than the thirteen hours in *Hoeplinger.* The defendant made no claim that the police had physically isolated him by driving him the short distance from 60 Warren Street to the police station.[12] The defendant concedes that he had not been seized before Howard left the interviewing room; we fail to see how this pause in the interrogation took on the coercive significance the defendant ascribes to it. Instead, we conclude that the circumstances experienced by the defendant are indistinguishable from those of other cases where we have held, under the "free to leave" standard, that a specific encounter between police and suspect was entirely consensual. See, e.g., *State* v. *Williams,* supra; *State* v. *Damon,* 214 Conn. 146, 152–55, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); *State* v. *Northrop,* supra, 414–15; *State* v. *Brown,* 199 Conn. 47, 52–54, 505 A.2d 1225 (1986). Accordingly, we hold that the trial court acted properly in finding that there was no seizure under the state

ment in the present case, the trial court could reasonably have found that both Howard and the defendant understood that their meeting was consensual, and therefore the defendant did not need to be expressly informed that he was free to leave.

[11] Howard could not remember exactly how long the interview lasted, but testified that it lasted "possibl[y]" less than an hour and he "doubt[ed]" it could have been as much as two hours. Fracasso testified that the time between arrival at the station and arrest was thirty to forty minutes.

[12] The state introduced a map of the city of New Haven into evidence as an exhibit. An examination of the map indicates that the police station where the defendant was interrogated is only several blocks away from 60 Warren Street, the scene of the crime and the place where the encounter between the police and the defendant began.

constitution until the defendant's formal arrest. Because we find that the defendant was not seized prior to his arrest, we need not reach the issue of whether there was probable cause to support a prearrest seizure.

## II

The defendant next claims that the trial court, at the probable cause hearing mandated by the state constitution, lacked sufficient evidence to find probable cause that the defendant was the person who had killed the victim, or that the defendant had intended to kill the victim. Without such a showing of probable cause, the trial court would not have jurisdiction over the defendant's person. *State* v. *Mitchell,* 200 Conn. 323, 512 A.2d 140 (1986). The state counters that there was a proper showing of probable cause on both issues. We agree with the state.

Prior to November, 1982, the state constitution required indictment by a grand jury before any person could be prosecuted with a crime punishable by death or life imprisonment. Id., 326. "This right to a grand jury determination of probable cause had its origin in our early statutory and common law and became part of our constitutional rights when the first state constitution was adopted in 1818." Id. In response to long-standing criticism of the secrecy and ex parte nature of the grand jury system; id., 326–27; the state constitution was amended in 1982, replacing the grand jury indictment system "with an open and adversarial probable cause hearing." Id., 328–29; see Conn. Const., art. I, § 8, as amended by amend. XVII, and implemented by General Statutes § 54-46a.

*State* v. *Mitchell,* supra, addressed the question of how, on appeal, a flawed or nonexistent probable cause hearing should affect an otherwise proper subsequent murder conviction. We held that a proper finding of probable cause is a "constitutional prerequisite to the

court's subsequent jurisdiction to hear the trial." Id., 330. Invoking the words of Justice Thurgood Marshall of the United States Supreme Court, we reasoned that " 'a right without an effective remedy has little meaning' " and therefore appellate review of the defective probable cause hearing would result in reversal of the underlying conviction. Id., 333, quoting *Guardians Assn.* v. *Civil Service Commission,* 463 U.S. 582, 626, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983) (Marshall, J., dissenting). We have repeatedly reaffirmed the holding that lack of probable cause deprived the court of jurisdiction over the defendant's person. *State* v. *Marra,* 222 Conn. 506, 513, 610 A.2d 1113 (1992); *State* v. *Boyd,* 214 Conn. 132, 136, 570 A.2d 1125 (1990); *State* v. *McPhail,* 213 Conn. 161, 170, 567 A.2d 812 (1989).[13]

On appellate review of a probable cause hearing, we must examine the evidence presented to the trial court at that hearing and determine whether it was sufficient to warrant a person of reasonable caution to believe that the accused had committed the charged offense. *State* v. *Marra,* supra, 513. "The quantum of evidence necessary to establish probable cause at a preliminary hearing is less than the quantum necessary to establish proof beyond a reasonable doubt at trial." (Internal quotation marks omitted.) *State* v. *Patterson,* 213 Conn. 708, 720, 570 A.2d 174 (1990). On the other hand, of course, evidence raising a mere suspicion that the defendant committed a murder would be insufficient to support a finding of probable cause. *State* v. *Marra,* supra; *State* v. *Patterson,* supra.

The trial court reasonably concluded that there was probable cause to believe that a murder had been com-

---

[13] The state argues that this court should reconsider and overrule *State* v. *Mitchell,* 200 Conn. 323, 512 A.2d 140 (1986). Because we hold that the trial court properly found probable cause to place the defendant on trial for murder, we need not reach this claim.

mitted and that the defendant had committed it. The trial court heard testimony from Mullins, Howard, and Terry, and also received as evidence the autopsy report of the chief medical examiner's office. From the following evidence, the court could reasonably have found probable cause that the defendant had caused the victim's death: testimony that the defendant had been seen entering and leaving the apartment building before and after the assault; the defendant's admission that he had been present in the victim's apartment at the time of the assault; the defendant's departure immediately after the attack; the presence of blood on the defendant's clothing and hands; and the testimony that the defendant had left the crime scene wearing a shirt and returned without a shirt, suggesting the destruction or concealment of evidence. While some of these facts are also consistent with the defendant's position, brought out through his statement to the police, that two other men had attacked the victim, the trial court was free to disbelieve the defendant's statement. The state also impeached this statement by introducing evidence that, although the defendant claimed to have run out of the building in pursuit of one of the men and written down a vehicle license number, other witnesses saw the defendant walking, not running, out of the building. Furthermore, the police check of the state motor vehicle records indicated that the license number he claimed to have written down did not exist. The trial court could also have considered the defendant's reaction to Howard's mention of the lamp as evidence that the defendant's version of events was false.

The trial court also reasonably found probable cause that the defendant had intended to kill the victim, based on the following: the autopsy report indicated multiple injuries to the head and neck; the finding in the report that the victim's death was a homicide; the presence of blood throughout the victim's apartment; the

defendant's own statement to the police that he was skilled in martial arts; and Mullins' testimony that there had been a violent struggle in the victim's apartment. From the detailed description of head and neck injuries in the autopsy report, a reasonable inference could be drawn, supporting the finding of probable cause of intent to kill, that the defendant intentionally aimed his blows at a particularly vital and vulnerable area of the body. See *State* v. *Carpenter,* 214 Conn. 77, 82–83, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992).

## III

The defendant finally claims that the trial court improperly denied his motion for judgment of acquittal because the state failed to produce sufficient evidence to establish beyond a reasonable doubt that the defendant intended to kill the victim. In reviewing a sufficiency claim, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Traficonda,* 223 Conn. 273, 278, 612 A.2d 45 (1992). In order to be convicted of murder, the defendant must have possessed the specific intent to cause the death of the victim. General Statutes § 53a-54a. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11); *State* v. *Raguseo,* 225 Conn. 114, 120, 622 A.2d 519 (1993). "Generally, intent can be proved only by circumstantial evidence. . . . Intent may be, and usually is, inferred from conduct. . . . An intent to cause death may be inferred from circumstantial evi-

dence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available." (Citations omitted; internal quotation marks omitted.) *State* v. *Carpenter,* supra, 82–83.

The defendant, relying on *State* v. *Carpenter,* supra, contends that the evidence supporting an inference of intent in the present case is insufficient to prove intent beyond a reasonable doubt because it does not exclude the reasonable hypothesis that the defendant acted with a merely reckless mens rea. In *Carpenter,* evidence was presented that the defendant Carpenter caused the death of a sick baby in his care by throwing the baby against a hard surface. Expert testimony indicated that the baby had died of a skull injury caused by a single blow of great force. Prior to the baby's death, but after Carpenter caused the baby's injuries, he had called the fire department to summon medical help. This court noted that proof beyond a reasonable doubt "is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion." Id., 84. We held that there was insufficient evidence to preclude the rational hypothesis that the defendant, out of frustration, had recklessly caused the death of the baby without any specific intent to kill. Id., 85. We based this conclusion on the lack of evidence of a motive to kill, the expert evidence that there had been a single blow, and the fact that the defendant had summoned medical help for the child immediately after causing the injuries with that single blow. Id., 83–84.

The defendant claims that *State* v. *Carpenter,* supra, mandates a reversal of his conviction because there was

no evidence of motive,[14] he returned to the scene to assist the authorities, and the victim's injuries, as characterized by the defendant, were not great. We disagree. The jury in this case, unlike the one in *Carpenter,* could reasonably have concluded from the state of the apartment and the expert testimony that the defendant pursued the victim through the apartment, striking him repeatedly in the head and neck, a fragile and vital area of the body to choose as a target. The victim was found in the building hallway, bloodied, unconscious, his forehead visibly compressed, outside his blood-soaked apartment, yet there is not the slightest evidence that the defendant made any attempt to help the victim in this case. We conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant intended to cause the victim's death.

The judgment is affirmed.

In this opinion PETERS, C. J., and NORCOTT, J., concurred.

CALLAHAN, J., concurring. I concur in the result.

BORDEN, J., concurring. I agree with both the reasoning and the result reached by the majority opinion. I write separately, however, regarding the suppression of evidence issue, only to repeat my disagreement with the majority's reliance on article first, § 9, of the Connecticut constitution.

The majority in this case cites *State* v. *Oquendo,* 223 Conn. 635, 659–60, 613 A.2d 1300 (1992), for that reliance. I recognize that, in *Oquendo,* a majority of that

---

[14] The state did not proffer any evidence as to a possible motive to kill. We note that although motive evidence is probative of the existence or absence of intent; *State* v. *Pinnock,* 220 Conn. 765, 790, 601 A.2d 521 (1992); motive evidence is but one factor in determining the intent of the defendant.

five member panel of this court based its conclusion regarding whether an unconstitutional seizure had taken place upon *both* article first, § 7,[1] which is our search and seizure provision, and article first, § 9,[2] which is our criminal due process provision.

In *State* v. *Oquendo,* supra, I questioned, and I continue to question, the appropriateness of the reliance on § 9, as opposed to § 7. See id., 669 n.1 (*Borden, J.,* dissenting). The fragility of the reliance on § 9 is particularly apt, considering the absence in *Oquendo* of any independent analysis of § 9 and considering the discussion in *State* v. *Lamme,* 216 Conn. 172, 579 A.2d 484 (1990), regarding the limited application of article first, § 9, to search and seizure issues.

[1] The Connecticut constitution, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[2] The Connecticut constitution, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."