STATE OF CONNECTICUT *v.* KENYA L. BEST
(AC 18895)

O'Connell, C. J., and Foti and Healey, Js.

Argued December 14, 1999—officially released February 29, 2000

*Raymond J. Rigat,* for the appellant (defendant).

*Lisa Riggione,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Maureen M. Keegan,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Kenya L. Best, appeals from the judgment of conviction of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3).[1] The defendant had been charged with the crimes

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

of murder in violation of General Statutes § 53a-54a (a)[2] and one count of capital felony for the murder of a person under sixteen years of age in violation of General Statutes § 53a-54b (9).[3] The defendant had pleaded not guilty and elected a trial by a three judge court, which found the defendant not guilty of the charges of murder and capital felony, but did find her guilty of the lesser included offense of manslaughter in the first degree. The court denied the defendant's motions for judgment of acquittal at the close of the state's evidence and at the time of sentencing. Thereafter, the court sentenced the defendant to twenty years incarceration. This appeal followed. We affirm the judgment of the trial court.

On appeal, the defendant claims that the trial court acted improperly in denying her motions for judgment of acquittal because there was insufficient evidence to sustain the conviction of manslaughter in the first degree. In doing so, she asserts that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that she acted either "under circumstances evincing an extreme indifference to human life" or "recklessly engage[d] in conduct which create[d] a

---

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (9) the murder of a person under sixteen years of age." At the time of her death on October 31, 1996, the victim, Mahkeva Best, was approximately twenty months old, having been born on February 23, 1995.

grave risk of death to another person . . . ." General Statutes § 53a-55 (a) (3). Although she does not challenge the state's contention that the evidence established a homicide, she claims that the evidence established only her culpability of the lesser included offense of manslaughter in the second degree[4] in that she "recklessly"[5] caused the death of another person. We disagree.

The trial court reasonably could have found the following facts. The victim, Mahkeva Best, was born on February 23, 1995, and was approximately twenty months old at the time of her death on October 31, 1996. At that time, she weighed twenty-two pounds and measured two feet, eight inches in height. On October 30, 1996, the defendant, who was Mahkeva's mother, was twenty-four years of age and resided with her boyfriend, Daryl Walker,[6] and the victim in an apartment in Waterbury. The defendant had worked as a certified nurse's aide since 1992. She had recently lost her job as a result of the loss of her car, however, and was very frustrated over that, as she had been unable to find another job.

From October 31 to November 2, 1996, the defendant gave four separate written statements to the Waterbury

[1] General Statutes § 53a-56 provides: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person; or (2) he intentionally causes or aids another person, other than by force, duress or deception, to commit suicide.

"(b) Manslaughter in the second degree is a class C felony."

[5] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

[6] The defendant had been estranged from her husband, David Best, since January, 1996. David Best was Mahkeva's father.

police.[7] According to the relevant portions of the fourth statement on November 2, 1996, the defendant stated,

[7] The defendant did not testify at her trial. She did, however, voluntarily give the Waterbury police four written statements from October 31 to November 2, 1996. All four statements were made at the Waterbury police department. She made the first statement on October 31, starting it at 6 a.m. and finishing it at 7 a.m. She made her second statement on October 31, starting it at 2:20 p.m. and finishing it at 3:55 p.m. She made her third statement on October 31, starting it at 7:50 p.m. and finishing it at 8:45 p.m. She made her fourth statement on November 2 starting at 6 p.m. and finishing it at 7:35 p.m.

The statements of the defendant varied, with the significant points as follows. In her first statement, the defendant stated: "On Tuesday the 29th, my daughter fell off the couch while she was playing and she hit her head on the coffee table." She continued and inculpated her boyfriend, Daryl Walker, stating, "when I undressed her and removed her diaper I saw bruises below her belly button near her stomach area and [Walker] pointed out the bruises and said to me 'what happened, how did those marks get there.' I told him that I did not know and I pressed her stomach and thought maybe it came from her diaper being too tight. . . . The only thing that I can figure out that happened is that [Walker] beat my daughter up. [Walker] is a violent person . . . ." In addition, the defendant stated that her daughter was "fine" when her estranged husband had returned her on Monday, October 28, 1996, and she had changed her "several times since then." Moreover, since her husband had returned Mahkeva, no one, except the defendant and Walker, had been with Mahkeva.

In her second statement, the defendant made no reference to Walker's beating the child, but stated rather, "I am now giving the police this second statement of my own free will at 2:20 p.m. I would just like to add some things that I do now remember. On Wednesday, 10-30-96 at about 1:00 p.m. I did give my daughter Mahkeva some Tylenol medicine because I thought she had a slight fever. I laid Mahkeva on the couch to give her this medicine . . . . While attempting to give Mahkeva this medicine I held her hands across her body both together and was also holding her face. While holding Mahkeva down she would be tussling with me and I would have to put pressure on her to make her stop. I would lean on her with my body putting pressure on her stomach to stop her from moving around. While doing this Mahkeva was tussling with me moving her head about and I had to hold her down with pressure from my arm. After doing this Mahkeva threw up the Tylenol . . . . I waited until about 2:30 p.m. on Wednesday, 10-30-96 to give her . . . Nyquil. In giving Mahkeva the Nyquil I went through the same routine as I did the first time. Mahkeva was again tussling with me and moving all around and once again I would put pressure on her stomach until she would stop and take the medicine."

At about 7:50 p.m. on the same evening, the defendant gave her third statement of that day, again making no reference to Walker beating the child and stating: "Because I have no job, I have no money, and I have been

"I want to say that I did hit Mahkeva with my hands on Wednesday, October 30, 1996. It was really actually my fists when I hit Mahkeva and how it happened is this: It was after 3:30 in the afternoon and as I mentioned in the last statement Mahkeva was laying on the couch on her back. As I had said earlier, Mahkeva was scratching at her [diaper] rash and whining most of the day. I went over to the couch to try to get her comfortable, and that is when she kicked me with her foot in my nose. When she did this, I said, 'Mama, why you did that,' and that is when I bit on her leg. (I always call Mahkeva Mama or Mommy.) After I bit her, she looked at me and I sat at the other end of the couch. A minute or two later she called out, 'Mama,' to me and started to come towards me, and I picked her up and laid her on my chest for a few more minutes. Then I laid her back down on the couch on her back and I was going to get up to make something to eat. As I was getting off of the couch, Mahkeva started whining again. I put

unable to find another job. Because of this I have been under a lot of stress and I have been very frustrated. My daughter Mahkeva had a very bad diaper rash and she was also sick when we woke up on Wednesday morning. She was whining a lot and I was having trouble making her comfortable during the morning. . . . Mahkeva was getting on my nerves because she wouldn't keep still. . . . She was irritable all day and I went over to her to try to comfort her when she lifted her leg up and kicked me in the nose. I got upset because she kicked me and I then bit her on her left leg. I was upset with her because my nose hurt as it has been broken twice. . . . I was also frustrated with Mahkeva earlier that day both times I was giving her the medicine. I had to be strong with her to get the medicine in her and when she threw up the Tylenol . . . I was very frustrated. I then got a phone call at approximately 2:30 p.m. from a Certified Nurses Agency telling me that a job I had hoped for was only available part-time. This call got me very upset and it was at this time I went to give Mahkeva the Nyquil medicine to try to make her go to sleep as she was still fussing. As I was giving her the Nyquil . . . she was fighting me and kept spitting out the medicine. I had to be strong with her again holding her down and trying to get the medicine in her mouth. As I tried to explain earlier, being strong with her means holding her down so she can't fight me."

These three statements, as well as the fourth statement, were admitted into evidence as full exhibits without objection.

the bottle next to her but she did not want the bottle. Mahkeva kept whining and I went over to her and I grabbed at my hair and I sat next to her on the couch. I stopped grabbing my hair and I clenched my hands into fists and hit Mahkeva with both my hands, saying out loud, 'Why is this happening to me, why is this happening to me.' I really don't know how many times I hit Mahkeva with my fists because 'I really lost it,' meaning that I lost my mind for that moment. I think that while all this happened [Walker] was in the shower. Right after I stopped hitting Mahkeva she began crying, I also started crying and I laid my head on Mahkeva's stomach. . . . I am very sorry for what I did."

Later that evening, Walker called a cab because he thought that Mahkeva did not look well and thought that she needed to go to the hospital. While waiting for the cab, the defendant changed Mahkeva's diaper and clothing, at which point Walker pointed out some bruising on Mahkeva's stomach area and asked the defendant what had happened. The defendant responded that she did not know what had happened, but that maybe the bruising was due to the child's diaper being too tight.

When Mahkeva was brought to the emergency room of Waterbury Hospital at about 3:15 a.m. the next morning, October 31, 1996, by the defendant and Walker, she was examined by Genevieve O'Connell, an attending physician. Mahkeva's heart had a very slow agonal beat.[8] O'Connell observed two bruises on Mahkeva's forehead, a relatively "fresh" bruise on the left forehead temple area and an older one on the right forehead side "about a week old"—all of which were "very visible" to the naked eye. There were four separate bruises in her abdominal area.[9] O'Connell's opinion was that the

---

[8] An agonal heartbeat is usually the last few beatings of the heart before it stops.

[9] One centered right around the "belly button," another on the left lower ribs, a third over the right hip pelvic area and a fourth over the left pelvic area. In addition, X rays taken of Mahkeva's body indicated a rib fracture.

four injuries to the abdominal area were due to blunt trauma with the force applied "multiple times."[10] The blunt force was of a size "about four inches in diameter" and was "consistent with a fist punch." A cardiac arrest team became involved, but was unsuccessful. None of the injuries about which O'Connell testified could have been caused by the medical intervention at the hospital on October 31, 1996. Mahkeva was pronounced dead at 5:15 a.m. O'Connell opined that the cause of Mahkeva's death was blunt trauma.

Later that day, Malka Shah, the associate medical examiner at the office of the chief medical examiner, performed the autopsy[11] in Farmington. She specializes in forensic pathology, which deals mostly with sudden death caused by trauma, why the trauma took place, what inflicted it and the extent of the trauma. Shah noted external injuries on Mahkeva's face, abdomen, left lower arm and left upper leg. Internally, the eighth and ninth ribs were fractured. There was extensive hemorrhaging throughout her entire abdominal area. The hemorrhaging extended to the entire abdominal wall at the right and left side. The cause of the injuries on this abdominal wall, opined Shah, was due to blunt force applied to the anterior abdominal wall causing ruptures of the capillaries and vessels and hemorrhage into the posterior wall itself. At least three blows were administered, as the abdomen was injured not only in the center, but also on the right and left sides. The injuries for the abdominal area were all inflicted at the same time. The

---

[10] The Waterbury police department was contacted by the hospital because of Mahkeva's condition. Officer David Sheehan arrived there about 3:50 a.m. While there, Sheehan spoke to the defendant. She asked him what was going to happen to her and whether he would be contacting the department of children and families. She never asked him about Mahkeva's condition, and he stated that she "seemed more concerned for her own [well-]being not for that of the child."

[11] During her medical career, Shah has performed "close to four thousand autopsies."

blunt trauma also injured major organs. Blunt trauma to Mahkeva's abdomen caused a laceration in her right renal vein, hemorrhage in her pancreas, liver and lungs, extensive hemorrhages in the large intestine and ascending colon, and a macerating[12] injury to her spleen. There was also bleeding on her posterior abdominal wall that came from the force applied to the anterior abdominal wall, which then passed through the organs to the posterior abdominal wall. The bleeding in her abdominal area was extensive. The cause of her bleeding[13] was the blunt trauma, which, according to Shah, "led her to bleed to death."

The injuries to Mahkeva's forehead were older than the injuries to her abdominal area. The one on the right side of her head was older than the one on the left. Both, however, were older than the abdominal injuries. According to Shah, the blunt force trauma to the abdomen and the bite mark were "of the same duration" or were inflicted on Mahkeva at about the same time.

Ira Titunik, a forensic odontologist,[14] became involved as a result of being contacted by Harold Wayne Carver, the state's chief medical examiner. Upon arriving in Waterbury in the evening of October 31, 1996, he met separately with the defendant and Walker, explained to them what he proposed to do in taking dental impressions of their upper and lower teeth as well as photographing that area. Thereafter, he went to the chief state medical examiner's office in Farmington, where he examined and photographed the tissue of the bite area excised from Mahkeva's left thigh. At the trial,

---

[12] A "macerating injury" is like a crushing injury, where the organ becomes "like a pulp."

[13] All of Mahkeva's bleeding was internal.

[14] Forensic odontology encompasses bite mark recognition. Essentially, it is the observing of a wound on tissue or food stuffs, the determination of whether it is a human or nonhuman bite mark and then using that in the determination for its importance in the particular case.

after explaining in detail how he had proceeded, Titunik gave his opinion that the bite mark had been made by the defendant.

At the time of her fourth statement, in telling Neil O'Leary, a detective lieutenant with the Waterbury police,[15] about Mahkeva's abdominal injuries, she demonstrated by pounding on his desk how she had struck the victim with both fists together. She could not remember how many times she had struck her daughter, but O'Leary said he counted her pounding five times on the desk. When O'Leary asked her to hit the desk as hard as she had hit Mahkeva, she looked at him and said, "What do you want me to do, break my hands?"

The defendant claims on appeal that the trial court improperly denied her motions for judgment of acquittal because there was insufficient evidence to sustain the conviction of manslaughter in the first degree. We disagree.

In *State* v. *Cansler*, 54 Conn. App. 819, 836, 738 A.2d 1095 (1999), we stated that "[t]he standard of review for a sufficiency of evidence claim is well settled. Our Supreme Court has stated: In reviewing [a] sufficiency [of evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231,

[15] O'Leary was in charge of this investigation and was also the supervisor in the Waterbury detective bureau assigned to major crimes.

253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). . . . *State* v. *Ingram*, 43 Conn. App. 801, 809, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997)." (Internal quotation marks omitted.)

In *Ingram*, this court stated: "We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989). *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *Haddad*, 189 Conn. 383, 390, 456 A.2d 316 (1983); *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. *State* v. *Perez*, supra, 227 . . . . *State* v. *Braxton*, [196 Conn. 685, 691, 495 A.2d 273 (1985)]. . . . *State* v. *King*, 216 Conn. 585, 602, 583 A.2d 896 (1990); *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984). [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992)." (Internal quotation marks omitted.) *State* v. *Ingram*, supra, 43 Conn. App. 810.

"It bears emphasis that [i]n evaluating evidence that could yield contrary inferences, the [trier of fact] is not

required to accept as dispositive those inferences that are consistent with the defendant's innocence. *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996). As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson*, [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Little*, 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . *State* v. *DeJesus*, supra, 196; see also *State* v. *Sivri*, [supra, 231 Conn. 134]. . . . *State* v. *Torres*, 242 Conn. 485, 490, 698 A.2d 898 (1997)." (Internal quotation marks omitted.) *State* v. *Cansler*, supra, 54 Conn. App. 837–38.

Furthermore, as an appellate court, we must determine whether the totality of the evidence, including reasonable inferences therefrom, viewed in the light most favorable to sustaining the trial court's verdict, supports the trial court's verdict of guilt beyond a reasonable doubt. Moreover, where a three judge court is the judge of the facts as well as the law, as is the case here, the court, as the triers of fact, is not to be expected to lay aside matters of common knowledge or their own observations and experiences of the affairs of life. Rather, they may apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct in the ultimate verdict that they may render. See id., 838.

As already noted, the statute on manslaughter in the first degree, insofar as pertinent to this case, General

Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." For the defendant to have been found guilty of this offense, the state had to prove beyond a reasonable doubt the following: (1) that the defendant engaged in conduct that created a grave risk of death; (2) that in doing so the defendant acted recklessly; (3) under circumstances evincing an extreme indifference to human life; and (4) the defendant caused the death of the victim. *State* v. *Shine*, 193 Conn. 632, 643, 479 A.2d 218 (1984); see *State* v. *Alston*, 5 Conn. App. 571, 576, 501 A.2d 764 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986). Additionally, the state had to prove that the defendant had the general intent[16] to engage in conduct that created a grave risk of death to another person under circumstances evincing extreme indifference to human life.[17] *State* v. *Shine*, supra, 639; see *State* v. *Alston*, supra, 576.

---

[16] A specific intent to kill or injure is not required. *State* v. *Shine*, supra, 193 Conn. 640.

[17] In referring to the nature of our review, the defendant cites the following proposition from *State* v. *Carpenter*, 214 Conn. 77, 84, 570 A.2d 203 (1990): "A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion." (Internal quotation marks omitted.) To suggest that *Carpenter* dictates our review on the sufficiency issue indicates a fundamental misconception of the relationship between the principles set out in *Carpenter* and the well established and traditional scope of review of trial court verdicts. See *State* v. *Sivri*, supra, 231 Conn. 132. To accept this argument of the defendant would mean, as *Sivri* points out, that in reviewing the sufficiency of evidence to support a guilty verdict, an appellate court would be required to give deference, not to the view of the evidence taken by the trial court that arrived at a guilty verdict, but to any reasonable hypothesis supplied by the defendant that, had it been accepted by the trial court, would have resulted in an acquittal. See id., 133; see also *State* v. *Greenfield*, supra, 228 Conn. 77.

In *Sivri*, our Supreme Court put it appropriately when it stated: "On

"No definition of 'extreme indifference to human life' is found in the [P]enal [C]ode, title 53a of the General Statutes . . . ." *State* v. *Pitt*, 28 Conn. App. 825, 830, 612 A.2d 60, cert. denied, 224 Conn. 907, 615 A.2d 1049 (1992); *State* v. *Bunker*, 27 Conn. App. 322, 326, 606 A.2d 30 (1992). We have pointed out in *Bunker*, drawing on *State* v. *Spates*, 176 Conn. 227, 236–37, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979), that the trial court in *Spates* "was upheld when it defined the term for the jury by stating that it meant more than 'mere carelessness' or 'ordinary recklessness' . . . ." *State* v. *Bunker*, supra, 326. It must be recognized that an "aggravated form of recklessness" is required to support a conviction under § 53a-55 (a) (3). *State* v. *Pitt*, supra, 830; *State* v. *Bunker*, supra, 327. In any event, the lack of a specific definition of "extreme indifference to human life" is not of significance, "especially when the defendant has not shown that the phrase was used in anything other than its ordinary meaning. *State* v. *Spates*, supra, 237." (Internal quotation marks omitted.) *State* v. *Pitt*, supra, 831. Some guidance, as to the level of "indifference" the legislature fairly perceived is gleaned by its designating the "indifference" in § 53a-55 (a) (3) by the adjective "extreme." That adjective has been defined to mean "existing in the highest or greatest possible degree." Webster's Third New International Dictionary. It is synonymous with "excessive." Id. What evinces an extreme indifference to human life is really a question of fact. *State* v. *Pitt*, supra, 831.

It is also true that there is no specific definition of the term "grave risk of death." The defendant has given us no analysis or argument that that term is used in

appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trial court's] verdict of guilty." *State* v. *Sivri*, supra, 231 Conn. 134.

anything other than its ordinary meaning. See *State* v. *Maresca*, 173 Conn. 450, 460–61, 377 A.2d 1330 (1977); *State* v. *Wall*, 40 Conn. App. 643, 670, 673 A.2d 530, cert. denied, 237 Conn. 924, 677 A.2d 950 (1991). We do note, however, that Webster defines the adjective "grave" as meaning "very serious; dangerous to life." Webster's Third New International Dictionary. "Recklessly," as already pointed out, is defined in the Penal Code, General Statutes § 53a-3 (13), and is an important component of the context of § 53a-55 (a) (3). The defendant's state of mind at the time she assaulted her daughter may be proven from her conduct before, during and after the attack. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state. *State* v. *Tucker*, 181 Conn. 406, 415, 435 A.2d 986 (1980); see also *State* v. *Greenfield*, supra, 228 Conn. 77. To be guilty of violating § 53a-55 (a) (3), it must be established that the defendant must have had the general intent to engage in the proscribed conduct. *State* v. *Shine*, supra, 193 Conn. 639; see *State* v. *Alston*, supra, 5 Conn. App. 577.

David Best, the estranged husband of the defendant, returned Mahkeva to the defendant's home on Monday, October 28, 1996, at which time she was "fine." From that time until the early morning hours of Thursday, October 31, 1996, when Mahkeva was taken to the hospital, no one except the defendant and Walker had any contact with Mahkeva. Although the defendant, in her first statement to the police, opined that Walker beat Mahkeva, it was not until several days later that she admitted that it was she, not Walker, who had beaten her child. That leaves her as the sole cause[18] of the

---

[18] "When there is evidence that . . . the injuries occurred while the child was in the sole [care] of the [defendant], the [trier of fact] is permitted to infer not only that the child's injuries were not accidental but that, in addition, they occurred at the culpable hands of [the defendant]. . . . *State* v. *Chapman*, [46 Conn. App. 24, 34, 698 A.2d 347 (1997)], quoting *State* v. *Dumlao*,

injuries, external and internal, to Mahkeva that resulted ultimately in the child's death.

On October 30, 1996, the defendant maintained that Mahkeva was "fine," although she acknowledges that on the previous day Mahkeva had fallen off the couch and hit her head on the coffee table. O'Connell, the attending physician who examined Mahkeva on October 31, 1996, said that the bruise on her left forehead was suffered within two days of October 31, 1996. On the morning of October 30, 1996, the defendant "realized" that the child was not well because she was "moaning, groaning and cranky" and she had a very bad diaper rash, which the child was scratching. There is no indication of what the defendant did to alleviate Mahkeva's diaper rash. When the defendant gave Mahkeva Tylenol and later, Nyquil, the child was "tussling" with her. The defendant had "to be strong" with her to administer the medication and to do so she held the child down "so she couldn't fight [her]."

On October 30, 1996, the defendant was stressed and frustrated because she could not find a job and the child was getting on her nerves as she would not keep still. That afternoon the child, who was lying on the couch, lifted up her leg and kicked the defendant in the nose. Thereupon, the defendant actually bit the child on her left thigh. Such shocking retaliatory action by a mother against her totally vulnerable child is inexplicable and adduces an especially culpable mental state. Her stress or frustration cannot legitimate this biting of her own twenty month old daughter.

It is, however, the defendant's beating of her daughter on the afternoon of October 30, 1996, shortly after biting her, together with its consequences, that starkly demon-

3 Conn. App. 607, 623, 491 A.2d 404 (1985)." (Internal quotation marks omitted.) *State* v. *Peruccio*, 47 Conn. App. 188, 195–96, 702 A.2d 1200 (1997), cert. denied, 243 Conn. 964, 707 A.2d 1266 (1998).

strates her extreme indifference to human life by engaging in conduct that created a grave risk of death to the child and did, in fact, cause her death. The nature, the scope and the severity of the injuries caused by the application, with great force, of the defendant's clenched fists to the child's abdominal area devastated Mahkeva's ability to live for more than one day. The number of blows that the defendant admitted to having inflicted to the abdominal area varied. The defendant, according to O'Leary, struck the desk five times when O'Leary asked her to demonstrate the number and force of the blows. O'Connell said there was a minimum of three blows. The defendant said four blows. The most stunning description of the amount of force with which the defendant struck her daughter came from the defendant when she finally admitted to O'Leary on November 2, 1996, that she had beat her daughter. At that time, O'Leary asked the defendant to hit the desk in the police interview room with that force with which she struck her daughter on October 30, 1996. She answered him by asking, "What do you want me to do, break my hands?" The force used by the defendant was so strong that it went through the anterior abdominal wall, through the area of a number of internal organs, all the way to the posterior abdominal wall.[19] Massive blood loss caused the child to bleed to death. Further evidence of the extreme indifference displayed by the defendant's inexplicable conduct was her failure, despite the obvious distress of the child and even her experience not only as a mother but also as a certified nurse's aide to seek any medical aid until Walker took that initiative. That, unfortunately for Mahkeva, took place many hours after the defendant beat her child. Throughout, her conduct was not "ordinary recklessness," but that

---

[19] The degree of force the defendant used to inflict the injuries may be inferred when from the fact that the blows to the abdomen were administered when the child was lying on a couch, a surface softer than a hard surface.

enhanced recklessness of the nature required to convict under § 53a-55 (a) (3). See *State* v. *Pitt*, supra, 28 Conn. App. 830.

Beyond all that we have pointed out, there is the consciousness of guilt reflected in the defendant's misstatements and changes in her statements to the police. *State* v. *Carter*, 196 Conn. 36, 48, 490 A.2d 1000 (1985); *State* v. *DeMatteo*, 186 Conn. 696, 702, 443 A.2d 915 (1982); see *United States* v. *Durrani*, 835 F.2d 410, 425 (2d Cir. 1983) ("[f]alse exculpatory statements made to law enforcement officers are circumstantial evidence and have independent probative force"). "False exculpatory statements have independent probative value [as consciousness of guilt] regardless of whether a defendant testifies on his behalf."[20] *United States* v. *Strother*, 49 F.3d 869, 877 (2d Cir. 1995). These principles apply to the misstatements and charges the defendant made as to her role in this sad matter and as to her early attempt to implicate Walker as the perpetrator.

From the cumulative effect of the evidence, together with reasonable inferences, the trial court could reasonably have concluded that the defendant was guilty of manslaughter in the first degree under § 53a-55 (a) (3). The evidence of the defendant's behavior in this case was sufficient for the court to find beyond a reasonable doubt that, under circumstances evincing an extreme indifference to human life, the defendant recklessly engaged in conduct that created a grave risk of the victim's death.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[20] The defendant in this case did not testify at trial.