# STATE OF CONNECTICUT *v.* SIDNEY WADE
## (AC 27397)

DiPentima, Gruendel and Lavine, Js.

Argued November 30, 2007—officially released March 25, 2008

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Paul N. Rotiroti*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. This case requires us to determine whether a layperson who provides illegally obtained prescription medications to a drug abuser who subsequently dies as a result of ingesting the medications is

guilty of manslaughter in the first degree because he acted under circumstances evincing an extreme indifference to human life and engaged in conduct that created a grave risk of death to another person, thereby causing the death of another person. See General Statutes § 53a-55 (a) (3). As a matter of law, we conclude that, under the factual circumstances of this case, the elements of the statute have not been met but that the evidence was sufficient to support a conviction of manslaughter in the second degree.

The defendant, Sidney Wade, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), two counts of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and one count of manslaughter in the first degree in violation of § 53a-55 (a) (3). On appeal, the defendant claims that (1) as a matter of law, there was insufficient evidence by which the jury could have found him guilty of manslaughter in the first degree and (2) the trial court improperly charged the jury with respect to all of the charges against him. We agree with the first but not the second of the defendant's claims.

On the basis of the evidence presented, the jury reasonably could have found the following facts. At about 3 p.m. on April 14, 2003, Elio Colon found his twenty year old girlfriend, Rebecca J. Calverley, unresponsive on an air mattress in the basement of 35X Darling Street in Southington, an apartment Colon shared with his family. Medical assistance was summoned by the defendant, but the victim was pronounced dead at the hospital. According to deputy chief medical examiner Edward T. McDonough, the victim died from methadone and fentanyl toxicity,[1] as there was enough of

---

[1] McDonough testified in part: "When I certify a cause of death related to drugs, I personally don't use the word overdose. That implies that there

each of the substances in the victim's body, alone or in combination, to cause her death.

The apartment was known as a place where individuals who abuse drugs went to use them. Marijuana, cocaine, angel dust, OxyContin and other pharmaceuticals were available there. When the police searched the premises, they found evidence of drugs and drug paraphernalia such as razor blades, pipes, marijuana roaches, cut straws and bags containing plant-like material.

On April 13, 2003, the day prior to the victim's death, Freeman Heath saw Colon and the defendant, who was twenty-seven years old at the time of the victim's death, standing in front of the apartment. At that time, the defendant was in possession of a bag containing Methadose[2] pills and fentanyl[3] lollipops. The defendant described the lollipops as morphine lollipops and gave one to Heath. Heath knew that the lollipops contained a narcotic pain reliever that was used by cancer patients who have a tolerance for narcotics. He also knew that ingesting the lollipop could result in death. It took about thirty or forty minutes for Heath's lollipop to dissolve. As a result of ingesting the lollipop, Heath felt sedated, numb, euphoric and high. He felt the effects of the lollipop until approximately 1:30 or 2 a.m. the next day.

is a certain level that in everybody is going to be lethal. I prefer to use the word *toxicity* because it's often the drug interacting with the brain or the heart at various different levels of concentrations that can cause an individual's death.

"For example, for cocaine, some people can use cocaine for years and years and many, many times and have no problem. Other times, people can use the cocaine for the very first time in relatively small amounts. It interacts with their heart and they die. So, that's why I prefer to use the word a *toxic effect* as opposed to a pure overdose effect." (Emphasis added.)

[2] Methadose is the pharmaceutical name of methadone, a drug commonly used in the treatment of heroin addiction.

[3] Fentanyl is a quick acting narcotic that primarily is used by cancer patients to relieve pain.

Later that day, Heath, Scott Finnemore and Galen Reynolds went to the apartment in search of a gasoline can because Reynolds' car had run out of gasoline. The victim was present in the residence and volunteered the use of a gasoline can that was at her home. After the victim, Heath, Finnemore and Reynolds had retrieved the gasoline can and gone to a gasoline station, they returned to the apartment. Heath and Finnemore encountered the defendant outside between 7:30 and 8 p.m. The defendant asked Finnemore if he was "straight"[4] and then showed him a plastic bag containing pills. The defendant handed Finnemore a pill. Finnemore took the pill and saw the word Methadose printed on it. Each pill contained forty milligrams of methadone and was scored so that it could be divided into four pieces. Finnemore knew that Methadose was a strong medication and potentially dangerous. He also knew that it was a prescription medication and that it had been obtained illegally.

The group moved inside to the kitchen. The defendant asked Finnemore if he wanted another pill and brought out the bag containing them and offered them to Finnemore, Heath and the victim. The defendant took out a pill, broke it into four pieces and placed it on a counter. Finnemore testified that he and Heath each took one quarter of the pill and that the victim took the other half. According to Heath, however, the victim told him that she took the whole pill. Heath knew that the pills were strong medication and expressed concern to the victim. The victim assured Heath that she had taken the drug before and could handle it. Heath testified that he knew the victim was a cocaine user.

The group[5] moved to the basement where everyone, except the victim,[6] smoked marijuana. The defendant

[4] Finnemore understood this to be an inquiry regarding whether he wanted a pill.

[5] The following individuals in addition to those named in the text also were present: Shaquita Jones, Nelson Ruiz and Renee Montanez.

[6] The victim generally did not smoke marijuana, as she preferred cocaine.

then offered them fentanyl lollipops, which were individually wrapped in a rectangular package bearing the brand name Actiq. Under the word Actiq, in parenthesis, appeared the words "oral transmucosal fentanyl citrate." The box was imprinted with "1600 mcg" and Rx only. The package contained numerous warnings, including "see insert for dosage and administration," "[o]nly for patients already taking opioids (narcotics) such as fentanyl or morphine," and, "WARNING: Keep out of reach of children." According to Shaquita Jones, one of the people in the apartment at the time, one week earlier, the defendant had offered her one of the lollipops and told her that it was not a regular lollipop but a medical one. Jones did not take a lollipop on that occasion, but the defendant did. He told Jones that the lollipop made one feel "real good," that one is not bothered by anything and "could get along with [one's] worst enemy."

The night of April 13, 2003, the defendant gave a lollipop to some of the people, including the victim, in the basement of the apartment. The victim had difficulty removing the wrapper and went upstairs with the defendant for about five minutes. When they returned to the basement, the victim had the lollipop in her mouth. The defendant appeared to have taken a bite of the victim's lollipop, which also was passed around for others to taste. Approximately half an hour later, the victim had finished her lollipop and asked the defendant for another one. The defendant gave the victim a second lollipop, which she ate. Later, the defendant gave Finnemore a lollipop, which Finnemore ate on his way home. Finnemore was aware of the potential for overdosing on drugs and had overdosed himself on methadone in 1999. The defendant also ate a lollipop while he was in the basement with the rest of the group.

The defendant left the apartment between 2 a.m. and 3 a.m. on April 14, 2003, and spent the rest of the night

with the mother of his child, Kelly Bartosiewicz. He returned to the apartment at 12:30 p.m. that day and fell asleep. He was awakened by Colon's mother, who told him that the victim was not breathing. The defendant ran to the basement and saw Colon breathing into the victim's mouth. The defendant told Colon to move the victim upstairs and then ran outside to borrow a neighbor's telephone to call 911. When the police arrived at approximately 3 p.m., the victim was lying on the floor, just inside the door of the apartment and a neighbor was administering cardiopulmonary resuscitation. The police could not detect a pulse in the victim; she was not breathing and her skin was cold to the touch and blue. The victim was taken to Bradley Memorial Hospital where she was pronounced dead.

Officer Jeremy Busa of the Southington police department asked the defendant if he had seen the victim the day or night before. The defendant initially told Busa that he had not seen the victim. Ten minutes later, after Busa had talked to others in the apartment, he again asked the defendant if he had seen the victim the night before. The defendant then responded that he had been in the apartment for a short time the night before and that he did not know what time he had seen the victim. The defendant also told Busa that to his knowledge, the victim had not been under the influence of drugs or alcohol. Later that day, the defendant gave a statement to the police. When asked if there were any drugs in the apartment the night before, the defendant responded that only marijuana was present. When the police searched the basement, they found an Actiq wrapper, among other things.

Approximately one week later, Jones was at the apartment with Reynolds, Colon and the defendant. According to Jones, when the subject of the victim's death came up, the defendant told Reynolds to tell Heath to "keep his mouth shut" because "people know"

where Heath lives. Also at about that time, the defendant told Kelly Ryzak, with whom he had an on and off relationship, that the victim had overdosed and died. A few weeks after that, the defendant told Ryzak that on the night the victim died, he had given drugs to her, that no one had seen him do so and that he did not give her enough for her to have died. When Bartosiewicz asked the defendant about the victim's death, he became upset and did not want to talk about the subject.

A number of expert witnesses testified about the medications that killed the victim and other pharmacological matters. Edward John Barbieri, who holds a doctorate degree in pharmacology, testified that fentanyl, like morphine, is an analgesic and has some of the side effects of morphine, such as sedation and respiratory depression. Methadone has the same properties and effects. He also testified that each person responds to drugs differently. Some people are very sensitive to drugs, and some are very resistant to drugs. The variability affects the time in which a person will demonstrate the effects of a drug after ingesting it. Morphine and fentanyl kill by respiratory depression. According to Barbieri, a person may respond to a drug and have good analgesic effects and be very resistant to the respiratory depressant effects, but that "may catch up" with the person later as the level of the drug rises in the blood. A person, therefore, could take a fentanyl lollipop and act normally for a period of time and die several hours later.

Gerald J. DeStefano, a pharmacist, is a senior drug control agent at the department of consumer protection. The drug control division regulates the flow of prescription drugs within the state. At trial, samples of a Methadose pill and a fentanyl lollipop were introduced through him. He testified about the various schedules

of controlled substances and the cost of certain medications. On the basis of his training and experience, DeStefano testified that individuals who illegally obtain prescription narcotics sometimes give them to other users. His testimony was based on "basically hundreds of nurses, doctors, pharmacists over the last ten years who have stolen prescription drugs and who have told me that they've shared them with other people." He also acknowledged that there is a huge market for those drugs.

I

The defendant's first claim is that, as a matter of law, the state failed to produce sufficient evidence by which he could be convicted of manslaughter in the first degree in violation of § 53a-55 (a) (3).[7] Specifically, the defendant claims that, under the circumstances, there was insufficient evidence that he acted recklessly with extreme indifference to human life, which created a grave risk of death to another person. We agree with the defendant.

A

Initially, we consider whether there was sufficient evidence to convict the defendant of a violation of § 53a-55 (a) (3). "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its

---

[7] Defense counsel made an oral motion for a judgment of acquittal at the end of the state's case-in-chief and at the conclusion of evidence. The court denied both motions because the motions concerned issues, particularly credibility, that were to be decided by the jury.

own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Hicks*, 101 Conn. App. 16, 21, 919 A.2d 1052 (2007).

During trial, the state filed an amended long form information. Count five alleged that the prosecutor "accuses [the defendant] of the crime of manslaughter in the first degree in violation of § 53a-55 (a) (3) and alleges that on or about April 13, 2003 at or near 35 Darling Street, Apartment X, Southington, Connecticut, the defendant . . . under circumstances evincing an extreme indifference to human life, recklessly engaged in conduct which created a grave risk of death to another person (to wit: Rebecca Calverley) and thereby caused the death of Rebecca Calverley."[8]

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." "For the defendant to have been found guilty of this offense, the state had to prove beyond a reasonable doubt the following: (1) that the defendant engaged in conduct that created a *grave risk of death*; (2) that in doing so the defendant acted *recklessly*; (3) under circumstances evincing an *extreme indifference to human life*; and (4) the defendant caused the death of the victim. . . . Additionally, the state had to prove that the defendant had the general intent to engage in

---

[8] Count six of the amended long form information alleged manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1). It stated that "[the prosecutor] accuses [the defendant] of the crime of manslaughter in the second degree in violation of Connecticut General Statutes § 53a-56 (a) (1) and alleges that on or about April 13, 2003 at or near 35 Darling Street, Apartment X, Southington, Connecticut, the defendant . . . recklessly caused the death of another person (to wit: Rebecca Calverley)."

conduct that created a grave risk of death to another person under circumstances evincing extreme indifference to human life." (Citations omitted; emphasis added.) *State* v. *Best*, 56 Conn. App. 742, 754, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000). In other words, we must ask if it was reasonably foreseeable to the defendant that the victim would die if he gave her the medication at issue. See, e.g., *Lofthouse* v. *Commonwealth*, 13 S.W.3d 236, 239 (Ky. 2000) (intent of statute to have causation issue framed in terms of whether result either foreseen or foreseeable by defendant as reasonable probability).

The defendant contends that the state failed to prove beyond a reasonable doubt that he knew that the medications he gave the victim were likely to cause her death or that a reasonable person under the circumstances would have known that they were likely to cause her death. Furthermore, relying on *State* v. *Best*, supra, 56 Conn. App. 742, the defendant argues that ordinary recklessness is not sufficient for a conviction of manslaughter in the first degree but that the state must prove that his conduct constituted an aggravated form of recklessness. Id., 755. Our task, therefore, is to construe the elements of § 53a-55 (a) and to apply them to the facts reasonably found by the jury.

"Statutory construction is a question of law and, therefore, our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Strich*, 99 Conn. App. 611, 633, 915 A.2d 891, cert. denied, 282 Conn. 907, 920 A.2d 310, cert. denied,

552 U.S. 901, 128 S. Ct. 225, 169 L. Ed. 2d 171 (2007). "We are required to construe a statute in a manner that will not thwart [the legislature's] intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Internal quotation marks omitted.) *State* v. *Coscuna*, 59 Conn. App. 434, 440, 757 A.2d 659 (2000).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Pearson*, 97 Conn. App. 414, 419–20, 904 A.2d 1259, cert. denied, 280 Conn. 934, 909 A.2d 963 (2006).

"A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13). "In looking to the statute itself, the legislature has provided some guidance as to the level of indifference it intended in § 53a-55 (a) (3) by modifying the level of indifference with the adjective extreme. Extreme is defined as existing at the highest or greatest possible degree, and is synonymous with excessive. . . . The adjective grave is defined as very serious: dangerous to life . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *McMahon*, 257 Conn. 544, 553–54, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002). Our Supreme Court has "concluded that the mental state required for a violation of § 53a-55 (a) (3) was clear. . . . Recklessness involves a subjective realization of a risk and a conscious decision to ignore that risk . . . ." (Citation omitted; internal quotation marks omitted.) Id., 555, quoting *State* v. *Bunkley*, 202 Conn. 629, 522 A.2d 795 (1987).

In assessing whether the defendant's giving the victim the medications at issue was an act evincing extreme indifference to human life that created a grave risk of death, we are bound to consider the circumstances in which they occurred. The evidence discloses that the defendant and the victim were part of what is commonly referred to as the drug culture in that they ingested illegal substances and medication not prescribed for them in association with other individuals. The jury reasonably could have inferred from the evidence that the two of them attended a party at the apartment for

the purpose of getting high. Although at least one of the witnesses had experienced the toxic, but not lethal, effects of ingesting an illegal substance or medication that had not been prescribed for him, there was no evidence that the defendant had had a similar experience. There was evidence that the defendant was in possession of the fentanyl lollipops and offered them to others as much as one week before the victim's untimely death. He himself previously had ingested fentanyl and found the experience pleasurable. Other people at the party ingested both the Methadose and fentanyl and did not have a toxic reaction. As Barbieri testified, the potentially toxic effect of drugs varies from person to person. Moreover, DeStefano testified that members of the health care profession in large numbers are known to obtain prescription medications and share them with others or sell them. In addition, evidence of the toxic effects of Methodose and fentanyl was presented to the jury by a series of expert witnesses. There was no evidence that the defendant actually possessed such knowledge.

The state has argued that the defendant acted under circumstances evincing extreme indifference to human life that created a grave risk of death by giving the victim more than one type of prescription medication in multiple dosages over a short period of time. The state claims that it is common knowledge that prescription medication has inherent risks and that its administration, therefore, must be overseen by a physician. The state also argues that it is common knowledge that taking certain medications in combination is inherently dangerous. The state, therefore, concludes that a reasonable person would not give another person either a combination of medications or multiple dosages of them over a short period of time because doing so creates a substantial risk of death. We are not persuaded that the average person knows the potentially toxic

effects of Methadose and fentanyl taken individually or in combination. Moreover, the circumstance in which the defendant gave the victim the medications was one in which the participants voluntarily sought and took medications and illegal substances in large quantities.

In our view, the case law from this jurisdiction and others that has been cited by the parties would support the state's position only if the defendant either had some specific reason to know of the grave risk created by the medications individually, or in combination, or engaged in some conduct evincing a more blatant disregard for the risks imposed. The parties have identified, and we could find, only one Connecticut case in which a defendant was convicted of manslaughter in the first degree for providing drugs to a person who died as a result of using those drugs. See *State* v. *Wassil*, 233 Conn. 174, 658 A.2d 548 (1995). The issue in that case, however, was whether there was sufficient evidence that delivering heroin to the victim was the proximate cause of death;[9] id., 181; not whether it was foreseeable that giving the subject medication to the victim would result in her death.[10] Moreover, the facts of that case are unlike the facts here. In *Wassil*, the defendant and the victim injected heroin into their own bodies. Id., 177. Soon after the victim injected himself, he lost consciousness. Id., 177–78. The defendant refused the advice of another to summon medical assistance immediately. Id., 178. It was not until more than an hour later, after the victim stopped breathing, that the defendant summoned help. Id. In the case before us, the defendant

[9] As the court in *Wassil* stated: "In the absence of such a challenge, we have no occasion to decide whether the evidence was sufficient to demonstrate that, in delivering the narcotics, the defendant had consciously disregarded[ed] a grave risk of death to [the victim] or that he had acted under circumstances evincing an extreme indifference to human life." (Internal quotation marks omitted.) *State* v. *Wassil*, supra, 233 Conn. 192 n.11.

[10] Our Supreme Court rejected the *Wassil* defendant's proximate cause claim. *State* v. *Wassil*, supra, 233 Conn. 191–92.

immediately called 911 upon hearing that the victim was unresponsive. Although the defendant did initially deny being at the party, we cannot say that the evidence proves beyond a reasonable doubt that the defendant in this case demonstrated an extreme indifference to human life by failing to get immediate medical assistance for the victim, as the defendant in *Wassil* did. See also *Palmer* v. *State*, 871 P.2d 429, 431 (Okla. Crim. App. 1994) (defendant left scene when asked to summon help for addict who had immediate adverse reaction to cocaine supplied by defendant).

*Lofthouse* v. *Commonwealth*, supra, 13 S.W.3d 236, is instructive. There, the defendant's conviction of reckless homicide required "proof beyond a reasonable doubt that there was a substantial and unjustifiable risk that [the victim] would die if he ingested the cocaine and heroin furnished to him by [the defendant], and that the risk of [the victim's] death was of such nature and degree that [the defendant's] failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the situation . . . i.e., that [the victim's] death as a result of ingestion of the cocaine and heroin was either foreseen or foreseeable by [the defendant] as a reasonable probability . . . ." (Citations omitted.) Id., 241. The Supreme Court of Kentucky concluded that the commonwealth "needed to prove not only the toxic qualities of cocaine and heroin, but also that a layperson, such as [the defendant], should reasonably have known that there was a substantial risk that the amount of cocaine and heroin ingested by [the victim] would result in his death." Id.

"Although the medical examiner . . . testified that the amount of morphine found in [the victim's] body can be fatal and that the amount of cocaine found in his body could be fatal, there was no proof that [the defendant] or any other layperson should have been aware that there was a substantial risk that [the victim]

would die from ingesting those substances, or that [the defendant's] failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. *Such information is not common knowledge.* On the other hand, there was evidence that heroin was something new to [the defendant]; that he, himself, had previously ingested dosages of both the cocaine and the heroin in question without fatal result; and that he, himself, ingested the same dosages of cocaine and heroin as [the victim] on the same occasion, yet remained coherent enough to assist in efforts to save [the victim's] life. The Commonwealth proved only that the dosages were fatal to [the victim]. That alone was insufficient to convict [the defendant] of reckless homicide." (Emphasis added; internal quotation marks omitted.) Id., 241–42.

Conversely, a conviction of murder in the second degree[11] was upheld against a defendant who supplied very potent cocaine to a victim, who had an immediate and severe reaction to the drug when he administered it to himself. See *Palmer* v. *State*, supra, 871 P.2d 431. The defendant in *Palmer* was aware that two weeks prior to the victim's death, the victim had had a severe reaction to drugs supplied by the defendant. Id., 433. The Oklahoma Court of Criminal Appeals concluded

---

[11] "No person may be convicted of murder in the second degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: *First,* the death of a human; *Second,* caused by conduct which was imminently dangerous to another person(s); *Third,* the conduct was that of the defendant(s); *Fourth,* the conduct evinced a depraved mind in extreme disregard of human life; *Fifth,* the conduct is not done with the intention of taking the life of or harming any particular individual.

"Depraved mind—a person evinces a depraved mind when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another.

"Imminently dangerous conduct—conduct is imminently dangerous where the conduct creates what a reasonable person would realize as an immediate and extremely high degree of risk of death to another person." (Emphasis in original.) *Palmer* v. *State*, supra, 871 P.2d 432–33.

that "a reasonable person in [the defendant's] position would have known that giving [the victim] very pure cocaine was imminently dangerous and created a high degree of risk of death. *We do not hold, however, that every delivery of a controlled dangerous substance resulting in death constitutes second degree murder.*" (Emphasis added.) Id.

The New York Court of Appeals upheld the conviction of a defendant for manslaughter in the second degree in *People* v. *Cruciani*, 36 N.Y.2d 304, 327 N.E.2d 803, 367 N.Y.S.2d 758 (1975). "On this appeal from a conviction of manslaughter in the second degree, the proof showing, among other things, that defendant . . . injected Margaret Heur with heroin (1) when, in his own words, she was already 'completely bombed out on downs' (depressants like morphine into which heroin is rapidly converted by the body's metabolic processes), (2) at a time when she had lost the capacity to 'walk or talk straight', and (3) despite his admission of awareness that there was a substantial possibility that a further injection in her then drug-saturated state would cause her to 'fall out' (in modern vernacular of drug users, that she would die) is fatal to any contention that he did not act recklessly within the meaning of section 125.15 of the Penal Law."[12] Id., 305.

In this case, we conclude that the circumstances and the conduct of the defendant are more similar to *Lofthouse* than to *Palmer* or *Cruciani*. Here, there was evidence that the defendant had been in possession of the fentanyl lollipops and distributed them to others for one week prior to the victim's death. The defendant himself ingested the lollipops. There was no evidence that the defendant or anyone to whom he had given

---

[12] "Under New York's statute the significant element is *scienter*, a showing that defendant was '*aware* of and *consciously* [disregarded] a substantial and unjustifiable risk' (Penal Law, § 15.05) . . . ." (Emphasis in original.) *People* v. *Cruciani*, supra, 36 N.Y.2d 305.

the medications had an adverse reaction to them. The warning on the label was directed toward children, not an adult such as the victim. The defendant knew the victim to be a person who abused drugs. The victim ingested the medications voluntarily, and the medications were not administered to her by another person. Prior to the group's going to the basement of the apartment, the defendant had given Methodose to others who had no adverse reaction. Moreover, the evidence at trial concerning the toxic effects and the lethal dosages of Methodose and fentanyl was presented by expert witnesses. Barbieri testified that he relied on Randall C. Baselt, an authoritative source,[13] for the range of concentrations of drugs in the blood that have been reported as lethal. Consequently, we cannot say that the defendant, as a layperson, knew of the toxic effects and the quantities of the subject drugs that would be lethal. Indeed, Barbieri's testimony indicated that the pharmacological effects of a drug can and do vary from one person to another. We reject, therefore, the state's argument that the risks associated with the ingestion of Methadose and fentanyl, alone or in combination, are commonly known by laypeople. We do not conclude, therefore, that the defendant's distribution of illegally obtained prescription medication to the victim, without more, justifies the jury's conclusion that he

---

[13] See R. Baselt, Disposition of Toxic Drugs and Chemicals in Man (7th Ed. 2004). "The purpose of this work is to present in a single convenient source the current essential information on the disposition of the chemicals and drugs most frequently encountered in episodes of human poisoning. The data included relate to the body fluid concentrations of substances in normal or therapeutic situations, concentrations in fluids and tissues in instances of toxicity and the known metabolic fate of these substances in man. . . . It is expected that such information will be of particular interest and use to toxicologists, pharmacologists, clinical chemists and clinicians who have need either to conduct an analytical search for these materials in specimens of human origin or to interpret analytical data resulting from such a search." See http://www.biomedicalpublications.com/dt7.htm (accessed 3/10/08).

created a grave or unjustifiable risk attendant to extreme indifference to human life.

In its brief, the state cites cases concerning convictions of manslaughter in the first degree under circumstances not related to drugs. The facts of those cases demonstrate that the grave risk of death associated with the subject conduct are within the common knowledge of a layperson and that no expert testimony would be necessary to educate the jury. See *State* v. *McCoy*, 91 Conn. App. 1, 2, 879 A.2d 534 (firing pistol at victim at close range), cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005); *State* v. *Best*, supra, 56 Conn. App. 751 (using fist to pound abdomen of toddler with force sufficient to break fist). Our own research of convictions for manslaughter in the first degree discloses similar conduct that creates an extreme risk of death that is within the common knowledge of a layperson. In *State* v. *McMahon*, supra, 257 Conn. 544 (defendant shot high powered rifle without proper sightline or backstop into area known to be frequented by walkers and bicyclists), our Supreme Court catalogued cases involving such conduct: "*State* v. *Carpenter*, 214 Conn. 77, 85, 570 A.2d 203 (1990) (affirming conviction where defendant caused death of baby by throwing her into bathtub . . .), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992); *State* v. *Pellegrino*, 194 Conn. 279, 294–95, 480 A.2d 537 (1984) (affirming conviction under § 53a-55 [a] [3] where defendant and accomplice set business on fire, and accomplice died in fire); *State* v. *Shine*, 193 Conn. 632, 643, 479 A.2d 218 (1984) (affirming conviction where intoxicated defendant drove car directly into two pedestrians causing their deaths); *State* v. *Spates*, [176 Conn. 227, 237, 405 A.2d 656 (1978)] (affirming conviction under § 53a-55 [a] [3] where defendant, in course of robbing victim, ignored victim's pleas for medical attention, resulting in victim's

death from heart attack); *State* v. *Johnson*, 29 Conn. App. 394, 396, 615 A.2d 512 (1992) (affirming conviction where defendant drove wrong way on highway, colliding with and causing death of victim), appeal dismissed, 227 Conn. 611, 630 A.2d 69 (1993); *State* v. *Hall*, 28 Conn. App. 771, 773, 612 A.2d 135, cert. denied, 224 Conn. 904, 615 A.2d 1045 (1992) (affirming conviction where defendant hit victim in head with brick causing his death)." *State* v. *McMahon*, supra, 555–56. These are all cases in which it is apparent that death could result from the conduct at issue.

The state also has cited cases involving the illicit use of drugs that it claims support its contention that it is common knowledge that providing medication to the victim would result in a grave risk of death. We disagree that the cases cited by the state support that contention. The issue in *State* v. *Clark*, 260 Conn. 813, 801 A.2d 718 (2002) (criminal possession of revolver), was whether the jury could rely on its own knowledge of the effects of marijuana on a person's ability to observe and recall without evidence of such effects. "[B]ecause it is an illegal substance, it may be that many jurors have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience." Id., 824. We cannot agree, however, that the potentially toxic effects of Methadose and fentanyl, far more complex matters, is common knowledge; in fact, the state presented expert testimony as to the toxic effects of those medications from at least

three witnesses. Furthermore, as noted, the experts testified that the manner in which one person metabolizes a drug is not the same way in which another person may metabolize or react to the drug.

*State* v. *Padua*, 273 Conn. 138, 869 A.2d 192 (2005) (risk of injury to child), concerned, in part, whether there was sufficient evidence "to sustain the defendants' convictions of risk of injury to a child because the state failed to introduce expert testimony to establish that the ingestion of raw marijuana is injurious to a child's physical health . . . ." Id., 142. Our Supreme Court held that "the Connecticut legislature has made the clear determination that marijuana is a dangerous substance from which children, especially, should be protected. The public is presumed to be aware of that determination. See, e.g., *Hebb* v. *Zoning Board of Appeals*, 150 Conn. 539, 542, 192 A.2d 206 (1963) ('[i]t is a familiar legal maxim that everyone is presumed to know the law')." *State* v. *Padua*, supra, 154–55. Our Supreme Court concluded that "it was reasonable for the jury to infer, on the basis of its own common knowledge and experience, that the ingestion of raw marijuana would likely be harmful to the health of a child. [It] recognize[d] that the precise physiological effects of marijuana and their severity may not be within the common knowledge of the average juror and that expert testimony would be helpful in establishing these effects." Id., 157. The effects of Methadose and fentanyl use on adults who voluntarily ingest them, even in their therapeutic form, are not a matter of common knowledge among jurors. We therefore cannot impute the specific risk of the illicit use of those medications to the defendant. Our Supreme Court made a similar holding in *State* v. *Smith*, 273 Conn. 204, 869 A.2d 171 (2005) (risk of injury to child), with respect to cocaine. While *Padua* and *Smith* imputed knowledge to those defendants that marijuana and cocaine were harmful to children, the court acknowledged that expert testimony

would be necessary to explain the form and extent of the harm.

For the foregoing reasons, we conclude that there was insufficient evidence that the defendant acted recklessly with extreme indifference to human life, which created a grave risk of death to another person.

B

Having concluded that there was insufficient evidence to convict the defendant of manslaughter in the first degree, we now consider the remedy. The defendant claims that his conviction must be vacated. The state posits that if we conclude that there was insufficient evidence to support the defendant's conviction of manslaughter in the first degree, we should remand the case to the trial court with direction to modify the judgment to reflect a judgment of conviction of manslaughter in the second degree; see General Statutes § 53a-56 (a) (1);[14] and to resentence the defendant accordingly. We agree with the state.

Our Supreme Court "has modified a judgment of conviction after reversal, if the record establishes that the jury necessarily found, beyond a reasonable doubt, all of the essential elements required to convict the defendant of a lesser included offense." *State* v. *Greene*, 274 Conn. 134, 160, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006). "[I]t is clear that any lesser degree of homicide may be considered by the trier, subject to the requirements of *State* v. *Whistnant*, [179 Conn. 576, 585, 427 A.2d 414 (1980)][15]. . . . It has been often reaffirmed that manslaughter in the first and second degrees and criminally

---

[14] General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[15] "A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or

negligent homicide are lesser included offenses within the crime of murder." (Citation omitted; internal quotation marks omitted.) *State* v. *Cartagena*, 47 Conn. App. 317, 323, 708 A.2d 964 (1997), cert. denied, 244 Conn. 904, 714 A.2d 3 (1998).

In this case, the state charged the defendant in separate counts with manslaughter in the first and second degrees. In this case, the principal substantive issue before the jury was the defendant's mental state at the time he provided the victim with the subject medications. Recklessness, as defined previously, is an element of both §§ 53a-55 (a) (3) and 53a-56 (a) (1). Because we have concluded that there was insufficient evidence that the defendant acted with extreme indifference to human life, he cannot be convicted of manslaughter in the first degree. As outlined previously, however, there was evidence that the defendant was aware of and consciously disregarded the substantial and unjustifiable risk of illegally distributing prescription medication and therefore acted recklessly. See General Statutes § 53a-3 (13). We therefore conclude that the defendant's conviction of manslaughter in the first degree should be reversed and the case remanded to the trial court with direction to modify the judgment to reflect a conviction of manslaughter in the second degree and to resentence the defendant in accordance with that conviction. See *State* v. *Greene*, 274 Conn. 162.

II

The defendant's second claim is that the court improperly charged the jury on the state's burden of

bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Whistnant*, supra, 179 Conn. 588.

proof and the presumption of innocence, requiring a new trial on all counts. This claim lacks merit.

The defendant specifically claims that the court improperly instructed the jury: "If you find that the state has failed to prove beyond a reasonable doubt each element of this offense, you shall find the defendant not guilty." The defendant argues that the court should have instructed the jury in keeping with his request to charge and § 2.51 of J. Pellegrino, Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001), i.e., "if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall then find the defendant not guilty." The defendant argues that the manner in which the court instructed the jury made it impossible for the jury to find the defendant not guilty of any of the charges against him.[16]

The state has drawn our attention to each of the court's instructions regarding its burden of proof. At the conclusion of its instruction on the burden of proof, the court stated in part: "The state must prove every element necessary to constitute the crime charged. If one element of the charge is lacking, you must find the defendant not guilty of that crime. . . . The state's obligation is to prove each and every element of the crime charged beyond a reasonable doubt." At the beginning of its instruction for each of the offenses with which the defendant was charged, the court instructed: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a

---

[16] In support of his argument, the defendant relies on *Green* v. *Young*, 264 Va. 604, 571 S.E.2d 135 (2002). He claims that the language of the trial court in *Green* is virtually identical to the language used by the trial court here. We disagree. The objectionable language in *Green* follows: "If you find that the Commonwealth has failed to prove beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty . . . ." Id., 608. The language of the two charges is not similar. The court here instructed the jury that if the state did not prove each element of the offense, the jury was to find the defendant *not guilty*.

reasonable doubt . . . ." After instructing the jury on the elements of each offense, the court charged: "For you to find the defendant guilty of this charge . . . the state must prove beyond a reasonable doubt each of the elements of each charge." At the end of its instruction on each of the charged offenses, the court stated to the jury: "Now, if you unanimously find that the state has proved beyond a reasonable doubt each of these elements of the offenses charged, you shall find the defendant guilty of this charge. *If you find that the state has failed to prove beyond a reasonable doubt each element of this offense, you shall find the defendant not guilty.*" (Emphasis added.)

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established. . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 179, 920 A.2d 236 (2007).

On the basis of our review of the court's entire instruction to the jury, we conclude that the court did not mislead the jury or commit error of a constitutional nature. The difference between the model jury charge urged by the defendant and the instruction given by the court is one without a meaningful distinction. The defendant's claim, therefore, fails.

The judgment is reversed only as to the conviction of manslaughter in the first degree and the case is

remanded with direction to modify the judgment to reflect a conviction of manslaughter in the second degree in violation of § 53a-56 (a) (1) and to resentence the defendant in accordance with that conviction. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.